Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ABDULLAH AL-KIDD,
            *Plaintiff-Appellee,*

v.

JOHN ASHCROFT,
            *Defendant-Appellant.*

No. 06-36059

D.C. No.
CV-05-00093-EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued April 8, 2008
Submitted May 18, 2009
Seattle, Washington

Filed September 4, 2009

Before: David R. Thompson, Carlos T. Bea, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.
Partial Concurrence and Partial Dissent by Judge Bea

12265

**COUNSEL**

Robert M. Loeb and Matthew M. Collette, Department of Justice, Civil Division, Washington, D.C., for the defendant-appellant.

Lee Gelernt, Immigrants' Rights Project, American Civil Liberties Union, New York, New York, for the plaintiff-appellee.

Alison M. Tucher, Morrison & Foerster, San Francisco, California, for amici curiae Former Federal Prosecutors.

Leo P. Cunningham and Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for amici curiae National Association of Criminal Defense Lawyers and Human Rights Watch.

---

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

According to the allegations of his first amended complaint, Plaintiff-Appellee Abdullah al-Kidd (al-Kidd), a United States citizen and a married man with two children, was arrested at a Dulles International Airport ticket counter. He was handcuffed, taken to the airport's police substation, and interrogated. Over the next sixteen days, he was confined in high security cells lit twenty-four hours a day in Virginia, Oklahoma, and then Idaho, during which he was strip searched on multiple occasions. Each time he was transferred to a different facility, al-Kidd was handcuffed and shackled about his wrists, legs, and waist. He was eventually released from custody by court order, on the conditions that he live with his wife and in-laws in Nevada, limit his travel to Nevada and three other states, surrender his travel documents, regularly report to a probation officer, and consent to home

visits throughout the period of supervision. By the time al-Kidd's confinement and supervision ended, fifteen months after his arrest, al-Kidd had been fired from his job as an employee of a government contractor because he was denied a security clearance due to his arrest, and had separated from his wife. He has been unable to obtain steady employment since his arrest.

Al-Kidd was not arrested and detained because he had allegedly committed a crime. He alleges that he was arrested and confined because former United States Attorney General John Ashcroft (Ashcroft), subordinates operating under policies promulgated by Ashcroft, and others within the United States Department of Justice (DOJ), unlawfully used the federal material witness statute, 18 U.S.C. § 3144, to investigate or preemptively detain him. Ashcroft asserts that he is entitled to absolute and qualified immunity against al-Kidd's claims. We hold that on the facts pled Ashcroft is not protected by either form of immunity, and we affirm in part and reverse in part the decision of the district court.

## FACTS AND PROCEDURAL BACKGROUND[1]

### A. Al-Kidd

Plaintiff-Appellee al-Kidd was born Lavoni T. Kidd in Wichita, Kansas. While attending college at the University of Idaho, where he was a highly regarded running back on the University's football team, he converted to Islam and changed his name. In the spring and summer of 2002, he and his then-wife were the target of a Federal Bureau of Investigation (FBI) surveillance as part of a broad anti-terrorism investigation allegedly aimed at Arab and Muslim men.[2] No evidence of criminal activity by al-Kidd was ever discovered. Al-Kidd

---

[1] All facts are taken from al-Kidd's first amended complaint, unless otherwise indicated.

[2] Al-Kidd is Muslim, but is African-American and not of Arab descent.

planned to fly to Saudi Arabia in the spring of 2003 to study Arabic and Islamic law on a scholarship at a Saudi university.

On February 13, 2003, a federal grand jury in Idaho indicted Sami Omar Al-Hussayen for visa fraud and making false statements to U.S. officials. On March 14, the Idaho U.S. Attorney's Office submitted an application to a magistrate judge of the District of Idaho, seeking al-Kidd's arrest as a material witness in the Al-Hussayen trial. Appended to the application was an affidavit by Scott Mace, a Special Agent of the FBI in Boise (the Mace Affidavit). The Mace Affidavit described two contacts al-Kidd had with Al-Hussayen: al-Kidd had received "in excess of $20,000" from Al-Hussayen (though the Mace Affidavit does not indicate what this payment was for), and al-Kidd had "met with Al-Hussayen's associates" after returning from a trip to Yemen. It also contained evidence of al-Kidd's contacts with officials of the Islamic Assembly of North America (IANA, an organization with which Al-Hussayen was affiliated),[3] including one official "who was recently arrested in New York." It ended with the statement, "[d]ue to Al-Kidd's demonstrated involvement

---

[3]The IANA is identified in the Al-Hussayen indictment as an organization with the "purpose of *Da'wa* (proselytizing), which included the website dissemination of radical Islamic ideology the purpose of which was indoctrination, recruitment of members, and the instigation of acts of violence and terrorism."

The IANA's web site currently disseminates a list of goals which include, *inter alia*, to "[u]nify and coordinate the efforts of the different dawah oriented organizations in North America and guide or direct the Muslims of this land to adhere to the proper Islamic methodology"; "[s]pread the correct knowledge of Islam"; "[w]iden the horizons and understanding . . . among Muslims concerning different Islamic contemporary issues"; "[a]ssist the oppressed and tyrannized scholars, Islamic workers and Muslim masses in any locality"; and "[c]reate programs and institutions that will serve the English-speaking Muslims of North America." Islamic Assembly of N. Am., *About IANA*, at http://www.iananet.org/about.htm (accessed June 10, 2009). Al-Hussayen, then a computer science graduate student at the University of Idaho, was accused of registering and running the IANA's web site.

with the defendant . . . he is believed to be in possession of information germane to this matter which will be crucial to the prosecution." The Mace Affidavit did not elaborate on what "information" al-Kidd might have had, nor how his testimony might be "germane"—let alone "crucial"—to the prosecution of Al-Hussayen.

The affidavit further stated:

> Kidd is scheduled to take a one-way, first class flight (costing approximately $5,000) to Saudi Arabia on Sunday, March 16, 2003, at approximately 6:00 EST. He is scheduled to fly from Dulles International Airport to JFK International Airport in New York and then to Saudi Arabia. . . . It is believed that if Al-Kidd travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena.

In fact, al-Kidd had a round-trip, coach class ticket, costing approximately $1700. The Mace Affidavit omitted the facts that al-Kidd was a U.S. resident and citizen; that his parents, wife, and two children were likewise U.S. residents and citizens; and that he had previously cooperated with the FBI on several occasions when FBI agents asked to interview him. The magistrate judge issued the warrant the same day.

Pursuant to the material witness warrant, al-Kidd was arrested two days later at the ticket counter at Dulles International Airport. He was handcuffed and taken to the airport's police substation, where he was interrogated. Thereafter, he was detained for an aggregate of sixteen days at the Alexandria Detention Center in Virginia, the Oklahoma Federal Transfer Center, and the Ada County, Idaho, Jail. He was strip searched on multiple occasions and confined in the high-security unit of each facility. During transfer between facilities, al-Kidd was handcuffed and shackled about his wrists, legs, and waist. He was allowed out of his cell only one to

two hours each day, and his cell was kept lit twenty-four hours a day, unlike other cells in the high-security wing.

On March 31, after petitioning the court, al-Kidd was ordered released, on the conditions that he live with his wife at his in-laws' home in Nevada, limit his travel to Nevada and three other states, report regularly to a probation officer and consent to home visits throughout the period of supervision, and surrender his passport. After almost a year under these conditions, the court permitted al-Kidd to secure his own residence in Las Vegas, Nevada, as al-Kidd and his wife were separating. He lived under these conditions for three more months before being released at the end of Al-Hussayen's trial, more than fifteen months after being arrested.[4] In July 2004, al-Kidd was fired from his job. He alleges he was terminated when he was denied a security clearance because of his arrest. He is now separated from his wife, and has been unable to find steady employment. He was also deprived of his chance to study in Saudi Arabia on scholarship.

Al-Kidd was never called as a witness in the Al-Hussayen trial or in any other criminal proceeding.

## B.  Ashcroft

Defendant-Appellant Ashcroft was Attorney General of the United States during the relevant time period. According to al-Kidd's complaint, following the September 11, 2001 terrorist attacks, Ashcroft developed and promulgated a policy by which the FBI and DOJ would use the federal material witness statute[5] as a pretext "to arrest and detain terrorism *sus-*

---

[4]Al-Hussayen was not convicted of any of the charges brought against him. His trial ended in acquittal on the most serious charges, including conspiracy to provide material support to terrorists, 18 U.S.C. §§ 2339A, 2339B. After the jury failed to reach a verdict on the remaining lesser charges, the district court declared a mistrial. The government agreed not to retry Al-Hussayen and deported him to Saudi Arabia for visa violations.

[5]The federal material witness statute, 18 U.S.C. § 3144, provides:

  If it appears from an affidavit filed by a party that the testimony

*pects* about whom they did not have sufficient evidence to arrest on criminal charges but wished to hold preventatively or to investigate further." (Cited in, and emphasis added, in al-Kidd's complaint.)

To support this allegation, the complaint first quotes Ashcroft's own statement at a press briefing:

> Today, I am announcing several steps that we are taking to enhance our ability to protect the United States from the threat of terrorist aliens. These measures form one part of the department's strategy to prevent terrorist attacks by taking *suspected terrorists* off the street . . . Aggressive *detention* of lawbreakers and *material witnesses* is vital to preventing, disrupting or delaying new attacks.

John Ashcroft, Attorney General, *Attorney General Ashcroft Outlines Foreign Terrorist Tracking Task Force* (Oct. 31, 2001), *available at* http://www.usdoj.gov/archive/ag/speeches/2001/agcrisisremarks10_31.htm (emphasis added in complaint). The complaint also cites internal DOJ memoranda quoted in a report by the DOJ's Office of the Inspector General (OIG Report),[6] which describe the use of "aggressive

of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title. No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

[6]*See* Office of the Inspector Gen., U.S. Dep't of Justice, *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration*

arrest and detention tactics in the war on terror," OIG Report at 12, including the use of material witness warrants to confine aliens suspected of terrorist involvement, *id*. at 38-39, 75. The complaint also quotes the public statements of a number of DOJ and White House officials implying or stating outright that suspects were being held under material witness warrants as an alternative means of investigative arrest or preventative detention. In addition to this direct evidence, the complaint cites a number of press reports describing the detention of numerous Muslim individuals under material witness warrants. The complaint further alleges that the policies designed and promulgated by Ashcroft have caused individuals to be "impermissibly arrested and detained as material witnesses even though there was no reason to believe it would have been impracticable to secure their testimony voluntarily or by subpoena," in violation of the terms of § 3144.

In his complaint, al-Kidd links his personal detention to these broader policies not only through inference, but also through the statements of Robert Mueller, the Director of the FBI. On March 27, while al-Kidd was jailed in Idaho, Mueller testified before Congress, listing five "major successes" in the FBI's efforts toward "identifying and dismantling terrorist networks." The first was the capture of Khalid Shaikh Mohammed, identified as "a key planner and the mastermind of the September 11th attack." The second was al-Kidd, iden-

---

*Charges in Connection with the Investigation of the September 11 Attacks* (2003), *available at* http://www.usdoj.gov/oig/special/0306/full.pdf. The OIG Report's focus is the post-9/11 detention on immigration charges of Arab and Muslim aliens, and touches only incidentally on those held as material witnesses. Because the report, an official government document, is cited extensively throughout the complaint, we deem it incorporated by reference, and take judicial notice of its entire contents. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (permitting incorporation by reference of documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading").

tified as having been "arrested . . . en route to Saudi Arabia." The other three "successes" all involved individuals "indicted" or "charged" with some crime connected to terrorism. *See FBI's Fiscal Year (FY) 2004 Budget: Hearing Before the Subcommitee on the Departments of Commerce, Justice and State, House Appropriations Commitee*, 108th Cong. (2003) (statement of Robert S. Mueller, III, Director, FBI), *available at* http://www.fbi.gov/congress/congress03/mueller032703 .htm (hereafter Mueller Testimony).

Finally, the complaint notes that "material witnesses have been routinely held in high security detention facilities." The OIG Report cites an Assistant U.S. Attorney who complained that the DOJ's Bureau of Prisons "did not distinguish between detainees who, in his view, posed a security risk and those detained aliens who were uninvolved witnesses." OIG Report at 20. It alleges "a general policy" of extensive mistreatment of material witnesses at the New York City Metropolitan Correctional Center (MCC). It cites a case, *United States v. Awadallah*, 202 F. Supp. 2d 55, 59-61 (S.D.N.Y. 2002) (*Awadallah I*), *rev'd on other grounds*, 349 F.3d 42 (2d Cir. 2003) (*Awadallah II*), which discusses the conditions of confinement of another putative material witness, Osama Awadallah, held in New York City. The complaint avers that Ashcroft "knew or reasonably should have known of the unlawful, excessive, and punitive manner in which the federal material witness statute was being used," and that such manner "would also foreseeably subject" detainees "to unreasonable and unlawful use of force, to unconstitutional conditions of confinement, and to punishment without due process."

## C.  Prior Proceedings

In March 2005, al-Kidd filed this lawsuit in Idaho federal district court. The first amended complaint was filed that November, naming as defendants, among others, Ashcroft, the United States, Mace and Gneckow (the two FBI agents named in the Mace Affidavit), and a number of government

agencies and officers in their official capacities.[7] It sought damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of al-Kidd's rights under the Fourth and Fifth Amendments to the Constitution (a "Bivens action"), and for a direct violation of § 3144.

Ashcroft moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6). The district court first denied the 12(b)(2) motion, holding that al-Kidd had properly alleged facts sufficient to establish personal jurisdiction over Ashcroft in Idaho. Specifically, al-Kidd had alleged that Ashcroft "spear-headed the post September 11, 2001 practice . . . to use the material witness statute to detain individuals whom they sought to investigate," and that "Ashcroft either knew or should have known the violations were occurring and did not act to correct the violations." Next, the district judge denied the 12(b)(6) motion, rejecting Ashcroft's claims of absolute and qualified immunity. The district court held that "[t]he development and practice of using the material witness statute to detain individuals while investigating possible criminal activity qualifies as police type investigative activity, not prosecutorial advocacy" for which absolute immunity is reserved. Turning to the claims for qualified immunity, the district court held that "the allegations against Mr. Ashcroft involve more than vicarious liability but assert claims involving Mr. Ashcroft's own knowledge and actions related to Mr. Kidd's alleged constitutional deprivations." The principal deprivation the district court mentioned was the allegation "that probable cause was not shown in the warrant application." The district court also rejected qualified immunity for the FBI agents.

Ashcroft filed a timely interlocutory appeal.

---

[7]Ashcroft is the only defendant in this case who filed an interlocutory appeal of the district court's denial of the defendants' Federal Rule of Civil Procedure 12(b)(2) and 12 (b)(6) motions. Accordingly, none of al-Kidd's claims against the other defendants is before us.

## JURISDICTION AND STANDARD OF REVIEW

### A.   Failure to State a Claim

Section 1291 of U.S. Code Title 28 grants this court jurisdiction over "final decisions" of the district court. Ordinarily, the denial of a motion under Federal Rule of Civil Procedure 12(b)(6) would not constitute a "final decision." The district court's denial of absolute and qualified immunity, however, is a "final decision" for § 1291 purposes because these immunities are immunities from suit, not just from damages. *See Mitchell v. Forsyth*, 472 U.S. 511, 525, 527 (1985).

As we have recognized in the past, interlocutory review of a Rule 12(b)(6) motion to dismiss puts our court in the difficult position of deciding "far-reaching constitutional questions on a nonexistent factual record." *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004). However, because Ashcroft chose to exercise his right to appeal before a fuller record could be developed, we proceed as we must in a review of all Rule 12(b)(6) motions, accepting as true all facts alleged in the complaint, and drawing all reasonable inferences in favor of the plaintiff. *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). To avoid dismissal under Rule 12(b)(6), a plaintiff must aver in his complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

We review de novo the district court's rulings on absolute and qualified immunity. *KRL v. Moore*, 384 F.3d 1105, 1110 (9th Cir. 2004); *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1179 (9th Cir. 2007).

### B.   Personal Jurisdiction

Ashcroft also argues that the district court does not have personal jurisdiction over him. Because denials of motions to

dismiss for lack of personal jurisdiction are not ordinarily reviewable on interlocutory appeal, Ashcroft requests that this court exercise its "pendent appellate jurisdiction" to reach the question of personal jurisdiction.

In *Hendricks v. Bank of America, N.A.*, we summarized the criteria for the exercise of pendent appellate jurisdiction:

> Under 28 U.S.C. § 1292(a)(1), we may exercise . . . pendent jurisdiction over any otherwise non-appealable ruling that is "inextricably intertwined" with or "necessary to ensure meaningful review of" the order properly before us on interlocutory appeal. District court rulings are "inextricably intertwined" with a preliminary injunction when the legal theories on which the issues advance are so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue. We also construe *Swint*'s "necessary to ensure meaningful review" language narrowly to require much more than a tangential relationship to the decision properly before us on interlocutory appeal.

408 F.3d 1127, 1134 (9th Cir. 2005) (quoting *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995)) (internal quotation marks, citations, and alterations omitted). Thus, Ashcroft must demonstrate that the issue of personal jurisdiction is either (1) "inextricably intertwined" with or (2) "necessary to ensure meaningful review of" the issues of absolute or qualified immunity, in order for us to exercise the pendent appellate jurisdiction he requests.

## DISCUSSION

Al-Kidd asserts three independent claims against Ashcroft. First, he alleges that Ashcroft is responsible for a policy or

practice under which the FBI and the DOJ sought material witness orders without sufficient evidence that the witness's testimony was material to another proceeding, or that it was impracticable to secure the witness's testimony—in other words, in violation of the express terms of § 3144 itself—and that al-Kidd was arrested as a result of this policy (the § 3144 Claim). Second, al-Kidd alleges that Ashcroft designed and implemented a policy under which the FBI and DOJ would arrest individuals who may have met the facial statutory requirements of § 3144, but with the ulterior and allegedly unconstitutional purpose of investigating or preemptively detaining them, in violation of the Fourth Amendment (the Fourth Amendment Claim). Finally, al-Kidd alleges that Ashcroft designed and implemented policies, or was aware of policies and practices that he failed to correct, under which material witnesses were subjected to unreasonably punitive conditions of confinement, in violation of the Fifth Amendment (the Conditions of Confinement Claim).

Ashcroft argues that he is entitled to absolute prosecutorial immunity as to the § 3144 and Fourth Amendment Claims. He concedes that no absolute immunity attaches with respect to the Conditions of Confinement Claim. He also argues that he is entitled to qualified immunity from liability for all three claims.

## A. Absolute Immunity

[1] In *Bivens* actions and those taken under 42 U.S.C. § 1983,[8] "[m]ost public officials are entitled only to qualified immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). Prosecutors are entitled to *absolute* immunity, however, when they

---

[8]The qualified and absolute immunity defenses to each are the same. *See Butz v. Economou*, 438 U.S. 478, 504 (1978) ("[W]e deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.").

engage in activities "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), and done "in the course of [their] role as an advocate for the State," *Buckley*, 509 U.S. at 273. They are entitled only to qualified immunity, however, when they perform investigatory or administrative functions, or are essentially functioning as police officers or detectives. *Id.* In addition, the United States Attorney General is not entitled to absolute immunity in the performance of his or her "national security functions." *Mitchell*, 472 U.S. at 520. The burden to establish absolute immunity rests with the official seeking it:

> The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been "quite sparing" in our recognition of absolute immunity, and have refused to extend it any "further than its justification would warrant."

*Burns v. Reed*, 500 U.S. 478, 486-87 (1991) (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988); *Harlow v. Fitzgerald*, 457 U.S. 800, 811 (1982)). "[I]f application of the principle is unclear, the defendant simply loses," and receives only the default of qualified immunity. *Buckley*, 509 U.S. at 281 (Scalia, J., concurring).

 **[2]** To determine whether an action is "prosecutorial," and so entitled to absolute immunity, the Supreme Court has adopted a " 'functional approach,' which looks to 'the nature of the function performed, not the identity of the actor who performed it.' " *Id.* at 269 (quoting *Burns*, 500 U.S. at 486; *Forrester*, 484 U.S. at 229). "In *Imbler*, the Court concluded that the 'reasons for absolute immunity appl[ied] with full force' to the conduct at issue because it was 'intimately associated with the judicial phase of the criminal process.' " *Van de Kamp v. Goldstein*, ___ U.S. ___, 129 S. Ct. 855, 861 (2009) (citing *Imbler*, 424 U.S. at 430). While the "duties of the prosecutor in his role as advocate for the State involve

actions preliminary to the initiation of a prosecution and actions apart from the courtroom," *Imbler*, 424 U.S. at 431 n.33, absolute prosecutorial immunity will be given "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct," *Burns*, 500 U.S. at 494.

As the Supreme Court has acknowledged, the distinction between the roles of "prosecutor" and "investigator" is not always clear. *See Imbler*, 424 U.S. at 431 n.33 ("Drawing a proper line between these functions may present difficult questions . . . ."). The Supreme Court has given us few bright lines,[9] and its cases on prosecutorial immunity have proceeded on a function-by-function basis. Thus, the Court has held that prosecutors receive absolute immunity for initiating a prosecution, *id.*, for presenting false or perjured testimony, *id.*, for appearing in court to apply for a search warrant, *Burns*, 500 U.S. at 492, and for preparing and filing an information and a motion for an arrest warrant, *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). By contrast, prosecutors receive only qualified immunity for giving legal advice to the police, *Burns*, 500 U.S. at 496, for investigating and fabricating physical evidence at a crime scene, *Buckley*, 509 U.S. at 274-75 (involving a bootprint left at the scene of a crime), for holding a press conference, *id.* at 276-78, and for acting as a complaining witness in support of a warrant application, *Kalina*, 522 U.S. at 130-31. *See also Van de Kamp*, 129 S. Ct. at 861.

In determining the scope of the functions to which absolute immunity extends, the Supreme Court has "generally looked for a historical or common-law basis for the immunity in

---

[9]One bright line the Supreme Court has given is that a "prosecutor neither is, nor should he consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. The converse, however, is not true: the mere presence of probable cause to have someone arrested "does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id.* at 274 n.5.

question." *Mitchell*, 472 U.S. at 521. The existence of a common-law immunity, however, is a necessary, but not sufficient, condition for the recognition of absolute immunity: "Even when we can identify a common-law tradition of absolute immunity for a given function, we have considered 'whether §1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions.' " *Buckley*, 509 U.S. at 269 (quoting *Tower v. Glover*, 467 U.S. 914, 920 (1984)).

Ashcroft contends that the decision to seek a material witness warrant is always a prosecutorial function. He has presented us with no historical evidence that a common-law tradition of absolute immunity from suit for prosecutors in seeking material witness arrests exists, and our own research has uncovered none, even though the practice of detaining witnesses who are not criminal suspects dates back to at least the 1840s. *See generally* Wesley MacNeil Oliver, *The Rise and Fall of Material Witness Detention in Nineteenth Century New York*, 1 N.Y.U. J.L. & LIBERTY 727 (2005). Other circuits, however, have held that the decision to seek a material witness warrant to secure a witness's testimony at trial is sufficiently related to judicial proceedings to be protected by absolute prosecutorial immunity. *See Betts v. Richard*, 726 F.2d 79, 81 (2d Cir. 1984); *Daniels v. Kieser*, 586 F.2d 64, 68-69 (7th Cir. 1978); *see also White ex rel. Swafford v. Gerbitz*, 860 F.2d 661, 665 n.4 (6th Cir. 1988) (suggesting in dicta that the decision to seek a material witness order is prosecutorial). *But see Odd v. Malone*, 538 F.3d 202, 217 (3d Cir. 2008) (holding "that the policies underlying the recognition of prosecutorial immunity do not apply with the same force" to detained material witnesses because "the aggrieved persons are unindicted third-party witnesses rather than criminal defendants"). In *Betts* and *Daniels*, the plaintiffs, who had been previously subpoenaed as witnesses, failed to appear on the day they were set to testify, and the prosecutor sought a material witness warrant. *Betts*, 726 F.2d at 80; *Daniels*, 586 F.2d at 66. The Seventh Circuit in *Daniels* held that

"[b]ecause defendant was attempting to secure Daniels' presence at the resumption of the trial, we must consider that he was functioning as an advocate rather than as an investigator or administrator," and was therefore entitled to absolute immunity. 586 F.2d at 69; *see also Betts*, 726 F.2d at 81 (citing *Daniels*).

Al-Kidd does not contest that absolute immunity ordinarily attaches to the decision to seek a material witness warrant. He contends, rather, that in his case, the decision to arrest was an act in furtherance of an investigative or national security function, for which the Attorney General may claim only qualified immunity. That is, al-Kidd claims he was arrested not in order to secure his testimony at Al-Hussayen's trial, but in order to detain, interrogate, and gather evidence against *him*, in particular. He notes that, in both *Betts* and *Daniels*, there was never any question that the material witness arrest was made for any reason other than to secure the witnesses' testimony at trial.

Ashcroft responds that any investigation into the purpose or motive behind the decision to arrest al-Kidd is inconsistent with the "functional" approach the Supreme Court has outlined. However, the cases he cites in support of this proposition are distinguishable. Those cases universally involve allegations that the otherwise prosecutorial action was secretly motivated by malice, spite, bad faith, or self-interest. *See, e.g.*, *Bernard v. County of Suffolk*, 356 F.3d 495, 504 (9th Cir. 2004) (alleging "racially invidious or partisan prosecutions"); *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 779 (9th Cir. 2001) (involving prosecutor accused of initiating prosecution in order "to deny the plaintiffs access to public works construction job sites"); *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) ("To foreclose immunity upon allegations that judicial and prosecutorial decisions were conditioned upon a conspiracy or bribery serves to defeat these policies."). None of these cases attempts to distinguish between a prosecutor's *investigative* or *national security* func-

tions and his *prosecutorial* functions, which is the question here.

**[3]** The cases distinguishing investigative and prosecutorial function take into account the goal of performing an action to determine function. In *Buckley v. Fitzimmons*, the Supreme Court held that the prosecutors lacked absolute immunity for their actions before they had probable cause to arrest a suspect because "[t]heir mission at that time was entirely investigative in character." 509 U.S. at 274. Even after a grand jury had been empaneled, the prosecutor's actions before it were not shielded by absolute immunity because "its immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest." *Id*. at 275.[10]

This circuit has followed the Supreme Court's instruction. In *KRL v. Moore*, a grand jury had indicted the plaintiff, based on evidence obtained from an initial search warrant, on twenty-one criminal counts, mostly concerning environmental infractions relating to the removal of an underground fuel storage tank. 384 F.3d at 1108. The following month, however, prosecutors obtained two additional warrants to search for evidence with little relevance to the charges in the indictment. *Id.* at 1109. We held that the prosecutors were engaged, at least in part, in investigative functions when they requested

---

[10]Justice Kennedy would have gone even further, extending the inquiry beyond "immediate" purpose:

> Two actors can take part in similar conduct and similar inquiries while doing so for different reasons and to advance different functions. It may be that a prosecutor and a police officer are examining the same evidence at the same time, but the prosecutor is examining the evidence to determine whether it will be persuasive at trial and of assistance to the trier of fact, while the police officer examines the evidence to decide whether it provides a basis for arresting a suspect. The conduct is the same but the functions distinct.

*Id.* at 289 (Kennedy, J., concurring in part, dissenting in part).

the second and third warrants, even though they already had probable cause as to those suspects for other crimes. We cited the prosecutors' investigatory purpose, which they had admitted both in depositions and on a talk radio program. *Id.* at 1114-15. "Thus, we conclude[d] that, because the warrant . . . was to further a 'stand-alone investigation' into environmental crimes, [defendants were] not entitled to absolute immunity from Plaintiffs' claim of judicial deception." *Id.* at 1115. By contrast, "the second search warrant had two goals: it sought evidence to prosecute the pending indictment against Womack, and it sought to investigate and uncover new crimes." *Id.* at 1111. We held that "to the extent the second search warrant sought evidence to prosecute the crimes charged in the indictment, [defendants'] review of the warrant prior to submission was intimately associated with the judicial process," and therefore entitled them to absolute immunity. *Id.* at 1112. Our focus on ends, rather than the labels attached to means, was explicit and effectively determinative.[11]

Likewise, in *Genzler v. Longanbach*, 410 F.3d 630, 638 (9th Cir. 2005), we noted that "[w]itness interviews may serve either an investigative or an advocacy-related function," and demonstrated how that function can be inferred from the circumstances of the interviews. In that case, the timing of the interviews, *id.* at 639, 642, as well as the "nature of the information obtained," *id.* at 640, led us to hold that "evidence in the record supports the conclusion that [the defendants] were

---

[11]In *KRL* we limited our holding to search warrants, rather than arrest warrants. *Id.* at 1114. This distinction was based on the Supreme Court's rule that "a prosecutor does not serve as an advocate before probable cause to arrest anyone has been established." *Id.* (citing *Buckley*, 509 U.S. at 274). The Supreme Court has been clear that probable cause to arrest is necessary, but not sufficient, to the prosecutorial function, and "does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5. At any rate, this distinction in dicta does nothing to detract from the teleological inquiry that was central to our holding.

engaged in police-type investigative work during" the witness interviews, *id.* at 642.[12]

Indeed, *Daniels* and *Betts*, while granting absolute immunity for material witness arrests, are entirely compatible with an inquiry into immediate purpose similar to that in *Genzler*. Both emphasized the close temporal and circumstantial connection between trial and seeking the arrest. *Betts*, 726 F.2d at 81; *Daniels*, 586 F.2d at 68-69. The *Daniels* court noted that "[i]n seeking to guarantee Daniels' presence at the trial through the material witness warrant, defendant was attempting to prove all elements charged in the indictment." *Id.* at 68. Other circuits have likewise used the language of purpose in determining function.[13]

---

[12]The dissent argues that an individual's detention on a material witness warrant "is subject to continuing oversight, and errors may be corrected though the judicial process[,]" and thus obviates " 'the need for damages actions to prevent unjust results.' " Dissent at 12352 (citations omitted). The Third Circuit has recently held the opposite, finding that the plaintiffs, who had been detained on material witness statutes, had demonstrated the need for damages actions because "by virtue of their status as third-party witnesses, Plaintiffs are not entitled to the protections available to criminal defendants, including the appellate process." *Odd*, 538 F.3d at 217.

[13]*See, e.g.*, *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 30-31 (1st Cir. 1995); *Parkinson v. Cozzolino*, 238 F.3d 145, 151 (2d Cir. 2001) ("There can be little doubt that conduct taken with the goal of affirming a conviction on appeal or obtaining a new conviction on re-trial falls within the traditional adversarial function of a prosecutor." (internal quotation marks omitted)); *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995) ("To the extent that the creation of the videotapes fulfilled an investigatory purpose, Adago cannot claim absolute immunity."); *Cousin v. Small*, 325 F.3d 627, 635 (5th Cir. 2003) ("The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause."); *Lomaz v. Hennosy*, 151 F.3d 493, 499 (6th Cir. 1998) ("The purpose for which they sought the warrant, therefore, was not primarily investigative, but was to obtain and preserve the evidence. We think that under these circumstances, the prosecutors were clearly 'preparing for the initiation of judicial proceedings.' " (quoting *Buckley*, 509 U.S. at 273)); *Lerwill v. Joslin*, 712 F.2d 435, 438 (10th Cir. 1983); *Rivera v. Leal*, 359 F.3d 1350, 1354 (11th Cir. 2004) (finding absolute immunity because, *inter alia*, "there is no indication that Leal was trying to establish probable cause to arrest Appellant. In fact, the purpose of the hearing was to establish whether [another individual] was innocent.").

**[4]** They were justified in doing so. Even were we not constrained by our precedents in *KRL* and *Genzler*, the Supreme Court, in adopting a "functional" test, has necessarily required us to look beyond the labels a prosecutor attaches to his or her actions and examine their underlying ends. The very word *function* reflects, at least in part, a teleological perspective. *See, e.g.*, Oxford English Dictionary, *Function* (2d ed. 1989) (defining "function" as "[t]he special kind of activity proper to anything; the mode of action by which it fulfils its purpose"). In *Buckley,* the Supreme Court found it proper to inquire into the prosecutor's *mission* and *purpose*, the very inquiry that Ashcroft and the dissent in this case find distasteful. 509 U.S. at 274-75.

Ashcroft's suggested approach, by contrast, would convert the Supreme Court's functional approach into a formalistic taxonomy of acts that are inherently either prosecutorial or investigative, regardless of what each act is really serving to accomplish. Because the application for the arrest warrant had the words "Material Witness" in the caption, Ashcroft seems to contend, our inquiry must stop there. Our dissenting colleague agrees, and would hold that so long as a material witness warrant is sought pursuant to a criminal trial, the decision to seek the material witness warrant should always be shielded by absolute immunity, regardless of whether its purpose was purely investigative. Dissent at 12351.

We disagree. Many tools and tactics available to prosecutors can serve either an investigatory or advocacy-related function. A grand jury may be used to return an indictment against a particular suspect, or to conduct a wide-ranging investigation. *Buckley*, 509 U.S. at 274. A witness interview's function may be to gather evidence, or to prepare the witness to testify at imminent trial. *Genzler*, 410 F.3d at 638. And the power to arrest, even as a material witness, can be investigatory. As cited in al-Kidd's complaint, Michael Chertoff, then Assistant Attorney General for the DOJ's Criminal Division, described the material witness statute as "an important *investi-*

*gative* tool in the war on terrorism . . . . Bear in mind that you get not only testimony—you get fingerprints, you get hair samples—so there's all kinds of *evidence* you can get from a witness." Steve Fainaru & Margot Williams, *Material Witness Law Has Many in Limbo: Nearly Half Held in War On Terror Haven't Testified*, Wash. Post, Nov. 24, 2002, at A1 (quoting Chertoff) (emphasis added).

Ashcroft argues that an inquiry into purpose cannot be cabined: a prosecutor filing charges against a foot soldier in an organized crime syndicate, for example, might hope that the prospect of a lengthy incarceration will encourage the defendant to turn state's evidence, permitting investigation of those higher in the organization. A wide-ranging investigation into such motives would likely prove unworkable. It is for that reason that the Supreme Court has spoken only of "*immediate* purpose." *Buckley*, 509 U.S. at 275 (emphasis added). As a common law court, we can rule only on the case before us. We believe, however, that while the prosecutor who files charges may hope, eventually, that the petty crook will implicate his boss, the *immediate* purpose of filing charges is to *begin a prosecution*—the better to pressure the defendant into providing information.

**[5]** We hold, therefore, that when a prosecutor seeks a material witness warrant in order to investigate or preemptively detain a suspect, rather than to secure his testimony at another's trial, the prosecutor is entitled at most to qualified, rather than absolute, immunity.[14] We emphasize that our hold-

---

[14]The dissent believes that such an inquiry is undesirable because of the incentives it creates. Dissent at 12358. Judge Bea states that our inquiry may make a prosecutor go to trial against a defendant simply to ensure his actions will not be subject to attack in a future lawsuit. We disagree. First, prosecutors often make choices regarding prosecutorial strategy that may be in tension with personal liability, *see Kalina*, 522 U.S. at 130-31, since all actions taken by a prosecutor are not entitled to absolute immunity. Second, we note that creating an incentive for a prosecutor to utilize a material witness he/she has detained for the very purpose alleged in his/her affidavit is not an undesirable incentive, and certainly not dispositive to the immediate purpose inquiry.

ing here does not rest upon an unadorned assertion of secret, unprovable motive, as the dissent seems to imply. Even before the Supreme Court's decision in *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*, it was likely that conclusory allegations of motive, without more, would not have been enough to survive a motion to dismiss. *See, e.g.*, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (facts pled must be accepted as true, but conclusory allegations need not be). *Twombly*'s general requirement that "[f]actual allegations must be enough to raise a right to relief above the speculative level," 550 U.S. 555, applies with equal force to allegations that a prosecutor's actions served an investigatory function. In this case, however, al-Kidd has averred ample facts to render plausible the allegation of an investigatory function:

- Al-Kidd's arrest was sought a month *after* Al-Hussayen was indicted, and more than a year *before* trial began, temporally distant from the time any testimony would have been needed. *See Genzler*, 410 F.3d at 639 ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function . . . ."). *Cf. Betts*, 726 F.2d at 81 (arrest warrant issued day of trial); *Daniels*, 586 F.2d at 68 (same).

- The FBI had previously investigated and interviewed al-Kidd, but had never suggested, let alone demanded, that he appear as a witness. *Cf. Betts*, 726 F.2d at 80 (subpoena issued; prosecutor called witness day before trial to remind her that trial was to begin the next day); *Daniels*, 586 F.2d at 65 (plaintiff had already been served one subpoena; second subpoena was misplaced by U.S. Marshal).

- The FBI conducted lengthy interrogations with al-Kidd while in custody, including about matters

apparently unrelated to Al-Hussayen's alleged visa violations. *Cf. Genzler*, 410 F.3d at 641-43 (nature of questions asked witnesses relevant to whether interview served investigative function).

- Al-Kidd *never actually testified* for the prosecution in Al-Hussayen's or any other case, despite his assurances that he would be willing to do so. Cf. *Betts*, 726 F.2d at 80 ("On Monday morning the trial proceeded and the prosecutor called plaintiff as his first witness."); *Daniels*, 586 F.2d at 66 ("Plaintiff subsequently testified as a government witness when Phoenix's trial resumed.").

All of these are objective indicia, similar to those we cited in *Genzler*, 410 F.3d at 641-43, that al-Kidd's arrest functioned as an investigatory arrest or national security-related preemptive detention, rather than as one to secure a witness's testimony for trial. Finally:

- Ashcroft's immediate subordinate, FBI Director Mueller, testified before Congress that al-Kidd's *arrest* (rather than, say, the obtaining of the evidence he was supposedly going to provide against Al-Hussayen) constituted a "major success[ ]" in "identifying and dismantling terrorist networks." Mueller Testimony, *supra*. *Cf. KRL*, 384 F.3d at 1114-15 (prosecutor contemporaneously admits on radio program that follow-up search warrant was part of "a stand-alone investigation").

We conclude that the practice of detaining a material witness in order to investigate him, on the facts alleged by al-Kidd, fulfils an investigative function.

## B. Qualified Immunity

The Attorney General may still be entitled to qualified immunity for acts taken in furtherance of an investigatory or

national security function. Before addressing each of al-Kidd's claims in turn, we address the general requirements of qualified immunity applicable to all his claims.

### 1. Qualified Immunity Generally

Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). It is within our "sound discretion" to address these two prongs in any sequence we see fit. *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009). Here, we apply the two-step *Saucier* analysis in the traditional sequence, as this sequence "promotes the development of constitutional precedent," which is especially valuable in addressing constitutional questions such as the one at hand, "that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* at 818.

### 2. Qualified Immunity for Supervisors

Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell*, 472 U.S. at 526, courts have also evaluated the sufficiency of the allegations of the defendant's personal involvement in the deprivation of the right at the second stage of the qualified immunity analysis. Neither a 42 U.S.C. § 1983 nor a *Bivens* action will hold a supervisor strictly vicariously liable for the actions of his subordinates under a theory of respondeat superior. *Iqbal*, 129 S. Ct. at 1948. Although this question is a part of the sub-

stance of § 1983 and *Bivens* liability, it is also a proper component of the qualified immunity inquiry:

> In conducting qualified immunity analysis . . . , courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct.

*Hope*, 536 U.S. at 751 n.9 (Thomas, J., dissenting). In *Kwai Fun Wong v. United States*, we, on interlocutory appeal, dismissed part of a *Bivens* action for failure to state a claim where the complaint "fail[ed] to identify what role, if any, each individual defendant had in placing [the plaintiff] in detention." 373 F.3d at 966.

Al-Kidd's complaint does not allege that Ashcroft was directly involved in the decision to detain al-Kidd. But "direct, personal participation is not necessary to establish liability for a constitutional violation." *Id.* Supervisors can be held liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotation marks omitted).

Any one of these bases will suffice to establish the personal involvement of the defendant in the constitutional violation.

### 3. The Fourth Amendment Claim

Al-Kidd's complaint principally alleges that Ashcroft "developed, implemented and set into motion a policy and/or practice under which the FBI and DOJ would use the material witness statute to arrest and detain terrorism *suspects* about whom they did not have sufficient evidence to arrest on criminal charges but wished to hold preventively or to investigate further." Al-Kidd argues that using § 3144 to detain suspects to investigate them violates the Fourth Amendment's guarantee against unreasonable seizure.

### a. Al-Kidd's Fourth Amendment Rights Were Violated.

[6] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

We have previously held that material witness arrests are "seizures" within the meaning of the Fourth Amendment and are therefore subject to its reasonableness requirement. *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir. 1971).

The Supreme Court has never held that detention of innocent persons as material witnesses is permissible under the Fourth Amendment,[15] and this circuit, in one of the few

---

[15]Two decisions have held that it does not violate *other* provisions of the Constitution. *See Hurtado v. United States*, 410 U.S. 578, 589-90

circuit-level cases to examine the validity of material witness detentions under the Fourth Amendment, declined to reach the facial constitutionality of the predecessor of § 3144. *Id.* at 941. Al-Kidd does not contend that § 3144 is facially unconstitutional. Rather, he contends that it is intended to be a "limited exception" to the ordinary rule that arrests may only be made upon probable cause of criminal wrongdoing. He further claims that its use for any purpose other than obtaining testimony, and specifically to investigate or preemptively detain terrorism suspects, without probable cause, is unconstitutional. Ashcroft contends that this position is inconsistent with *Whren v. United States*'s rule that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. 806, 813 (1996). But arrests of material witnesses are neither "ordinary,"[16] nor involve "probable cause" as that term has historically been understood.

_____

(1973) (Fifth and Thirteenth Amendments); *New York v. O'Neill*, 359 U.S. 1, 6-7 (1959) (Privileges or Immunities Clause of the Fourteenth Amendment). Dicta in two other cases suggest that the practice is ordinarily permissible. *See Stein v. New York*, 346 U.S. 156, 184 (1953), *overruled by Jackson v. Denno*, 378 U.S. 368 (1964) ("The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness."); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 616-17 (1929) ("[A] court has power in the exercise of a sound discretion to issue a warrant of arrest without a previous subpoena when there is good reason to believe that otherwise the witness will not be forthcoming. . . . The constitutionality of this statute apparently has never been doubted.").

[16]In 2003, the year of al-Kidd's arrest, material witness arrests made up only 3.6% of all arrests by federal law enforcement agents. Of those, 92.3% were made by the former Immigration and Naturalization Service, typically to detain illegally smuggled aliens for testimony against their smugglers before removal. *See, e.g.*, *Aguilar-Ayala v. Ruiz*, 973 F.2d 411 (5th Cir. 1992). Less than 0.3% of arrests by non-immigration federal law enforcement agents were material witness arrests. *See* Bureau of Justice Statistics, U.S. Dep't of Justice, *Compendium of Federal Justice Statistics, 2003*, NCJ No. 210299 (2005), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/cfjs0301.pdf, at 18.

**[7]** *Whren* rejected only the proposition that "ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause *to believe that a violation of law has occurred*." *Id.* at 811 (emphasis added). Indeed, *probable cause*, since before the founding, has always been a term of art of criminal procedure. As Chief Justice Marshall wrote:

> [T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation; and, in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion. In this, its legal sense, the Court must understand the term to have been used by Congress.

*Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813). Its most famous modern formulation comes from Justice Stewart's opinion in *Beck v. Ohio*:

> Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

379 U.S. 89, 91 (1964). This definition has been reiterated in Supreme Court cases over the decades:

> This Court repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circum-

> stances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Probable cause has both a burden-of-proof component (facts sufficient to make a reasonable person believe . . . ) and a substantive component ( . . . that the suspect is involved in crime). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (citations and quotation marks omitted). An arrest of a material witness is not justified by probable cause because the two requirements of § 3144 (materiality and impracticability) do not constitute the elements of a crime.[17]

The dissent disputes this traditional definition of probable cause, contending that no substantive component exists and that *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), prevents an inquiry into whether wrongdoing has occurred. Dissent at 12338. The dissent misreads *Zurcher* and confuses the different requirements for probable cause in situations for the seizure of a person and the probable cause required for a search warrant. As *Zurcher* explains, "while probable cause for arrest requires information justifying a reasonable belief that a crime has been committed and that a particular person committed it, a search warrant may be issued on a complaint which does not identify any particular person as the likely offender." *Id.* at 556 n.6. Thus, the dissent's analogy to *Zurcher* is inapplicable, and nothing in our holding here contravenes *Zurcher*.

---

[17]One *may* commit a crime by ignoring or disobeying a subpoena. 18 U.S.C. § 401(3) (authorizing criminal contempt for "[d]isobedience or resistance to [a court's] lawful writ, process, order, rule, decree, or command"). This was not the case here, where al-Kidd does not ever seem to have been subpoenaed.

Further, our decision in *Bacon v. United States* is not to the contrary. In *Bacon*, we held that the two criteria for arrest in the predecessor of § 3144, materiality of the witness's testimony and impracticability of securing the witness's testimony by subpoena, must be met by "probable cause" to arrest the material witness. 449 F.2d at 943.[18] We stated that "[t]hese requirements are reasonable, and if they are met, an arrest warrant may issue." *Id. Bacon* cannot be read for the proposition that this alone satisfies the "probable cause" requirement of the Fourth Amendment, however, and even if it could, such a reading has been superseded by the dozens of subsequent Supreme Court reaffirmations of the traditional definition of probable cause. Rather, *Bacon* simply borrowed, by analogy, some of the *procedural* protections traditionally afforded to criminal suspects, including the burden-of-proof component of probable cause. We therefore required that the elements of the material witness statute be shown by "probable cause," not because that, in itself, satisfies the Fourth Amendment's "probable cause" requirement, but because permitting arrests only upon establishing the elements by that burden of proof was "reasonable" under the Fourth Amendment. *Id.*

---

[18]The petitioner in *Bacon* was detained as a material witness in a grand jury proceeding. We stated that "a mere statement by a responsible official, such as the United States Attorney, is sufficient to satisfy" the materiality criterion in the case of a witness for a grand jury, which maintains broad powers of investigation and whose proceedings are secret. 449 F.2d at 943. *Bacon* reserved the question of what showing is necessary "in the case of a witness who is to testify at a trial." *Id.* We currently see no reason that the showing of materiality as to the witness in a trial, where proceedings are public and bound by the charges in the indictment, should be any different from the showing required for impracticability.

Because Al-Hussayen had already been indicted by the time of al-Kidd's arrest, we do not address whether *Bacon*'s statement that grand juries are "criminal proceedings" within the meaning of the material witness statute was a holding or *obiter dicta. Compare Awadallah I*, 202 F. Supp. 2d at 71 (holding the *Bacon* language to be dicta because it was unnecessary to the conclusion that the affidavit was insufficient to show impracticability), *with In re Application for a Material Witness Warrant*, 213 F. Supp. 2d 287, 291 (S.D.N.Y. 2002) (finding the same language to be a holding).

**[8]** Because material witness arrests are seizures without suspicion of wrongdoing, the *Whren* rule, that subjective motivation is irrelevant in the presence of probable cause, does not apply to our Fourth Amendment analysis in this case. In *City of Indianapolis v. Edmond*, the Supreme Court struck down motor vehicle checkpoints set up "to interdict unlawful drugs" carried by those stopped. 531 U.S. 32, 35 (2000). The Court explained that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion. Accordingly, *Whren* does not preclude an inquiry into programmatic purpose in such contexts." *Id.* at 45-46. The Court went on to clarify:

> our cases dealing with intrusions that occur pursuant to a general scheme absent individualized suspicion have often required an inquiry into purpose at the programmatic level.
>
> . . . [W]e examine the available evidence to determine the primary purpose of the checkpoint program. While we recognize the challenges inherent in a purpose inquiry, courts routinely engage in this enterprise in many areas of constitutional jurisprudence as a means of sifting abusive governmental conduct from that which is lawful. As a result, a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar. While reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs and administrative search cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue.

*Id.* at 46-47 (citation omitted).

**[9]** *Edmond*, therefore, establishes that "programmatic purpose" is relevant to Fourth Amendment analysis of programs of seizures without probable cause.[19] It further establishes that if that programmatic purpose is criminal investigation, it is fatal to the program's constitutionality: "the constitutional defect of the program is that its primary purpose is to advance the general interest in crime control." *Id.* at 44. The following year's *Ferguson v. City of Charleston* held unconstitutional a program of mandatory drug testing of maternity patients because "the immediate objective of the searches was to generate evidence *for law enforcement purposes*" against the women tested. 532 U.S. 67, 83 (2001). By contrast, in *Illinois v. Lidster*, the Court *upheld* seizures at a motor vehicle checkpoint set up by the police a week after a hit-and-run accident, "at about the same time of night and at about the same place" as the accident, where the checkpoint was "designed to obtain more information about the accident from the motoring public." 540 U.S. 419, 422 (2004). The Court in *Lidster* distinguished the seizure in *Edmond* on the basis that, in *Lidster*:

> the stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood commit-

---

[19]The dissent contends that *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983), does not allow such a broad reading of *Edmond*. Dissent at 12340-41. *Villamonte-Marquez*, however, is factually limited to searches of sea vessels located in waters providing ready access to the open sea. 462 U.S. at 581 ("[W]e are concerned only with the more narrow issue" of whether "the Fourth Amendment is offended when Customs officials . . . board for inspection of documents a vessel that is located in waters providing ready access to the open sea"). The Supreme Court has expressly distinguished searches of such sea vessels from other types of searches—those of automobiles on land, for example. *Id.* at 584-92. Only under the most contorted reading of *Villamonte-Marquez* would that case also apply to the pretextual detention of a person under a material witness statute.

ted by others. The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals.

*Id.* at 423. As Justice Stevens wrote in concurrence, "[t]here is a valid and important distinction between seizing a person to determine whether she has committed a crime and seizing a person to ask whether she has any information about an unknown person who committed a crime a week earlier." *Id.* at 428 (Stevens, J., concurring in part, dissenting in part).[20] That is precisely the distinction at work here, and the reason we hold that Ashcroft's policy as alleged was unconstitutional.

[10] Al-Kidd alleges that he was arrested without probable cause pursuant to a general policy, designed and implemented by Ashcroft, whose programmatic purpose was not to secure testimony, but to investigate those detained. Assuming that allegation to be true, he has alleged a constitutional violation. Contrary to the dissent's alarmist claims, we are not probing into the minds of individual officers at the scene; instead, we are inquiring into the programmatic purpose of a general policy as contemplated by *Edmond*, 531 U.S. at 457, and finding that the purpose of the policy alleged in al-Kidd's first

---

[20]We are mindful of the difference between a traffic stop and a material witness arrest. The material witness is subject to a seizure an order of magnitude greater than that at issue in *Lidster*, where the stops were "brief," and were of drivers in their cars. (As the Court noted, the "Fourth Amendment does not treat a motorist's car as his castle." 540 U.S. at 424.) An individual seized as a material witness is taken from her home and daily affairs and confined to a small space for a period of time measured not in minutes or even hours, but ranging from days to months. Al-Kidd disclaims any attack on material witness detention generally, and we are in any event bound by *Bacon*'s determination that the material witness statute, backed by a "probable cause" requirement to guarantee particularity, has struck a "reasonable" balance between the witness's interest in liberty and the government's need for testimony. But the severity of the deprivation of liberty in material witness arrests only militates for correspondingly more severe judicial scrutiny of its application.

amended complaint impermissible under the Fourth Amendment.

**[11]** Further, the dissent's assertion that we are suggesting "the only governmental interest of sufficient weight to justify an arrest is a reasonable belief that the arrestee has committed a crime" grossly mischaracterizes our holding. Dissent at 12336. To the contrary, we recognize that when the material witness statute is genuinely used to secure "testimony of a person . . . material in a criminal proceeding" because "it is shown that it may become impracticable to secure the presence of the person by subpoena," 18 U.S.C. § 3144, a showing of probable cause is not required. Our holding does nothing to curb the use of the material witness statute for its stated purpose. *What we do hold is that probable cause— including individualized suspicion of criminal wrongdoing— is required when 18 U.S.C. § 3144 is not being used for its stated purpose, but instead for the purpose of criminal investigation.* We thus do not render the material witness statute "entirely superfluous," dissent at 12339; it is only the *misuse* of the statute, resulting in the detention of a person without probable cause for purposes of criminal investigation, that is repugnant to the Fourth Amendment.

**[12]** All seizures of criminal suspects require probable cause of criminal activity. To use a material witness statute pretextually, in order to investigate or preemptively detain suspects without probable cause, is to violate the Fourth Amendment. *Accord Awadallah II*, 349 F.3d at 59 ("[I]t would be improper for the government to use § 3144 for other ends, such as the detention of persons suspected of criminal activity for which probable cause has not yet been established.").

### b. Al-Kidd's Right Was "Clearly Established."

Ashcroft alternatively contends that if we conclude that the use of material witness orders for investigatory purposes vio-

lates the Constitution, we should still grant him qualified immunity because that constitutional right was not "clearly established" in March 2003, when al-Kidd was arrested. We disagree.

In March 2003, no case had squarely confronted the question of whether misuse of the material witness statute to investigate suspects violates the Constitution. Both the complaint and *Amici* Former Federal Prosecutors note the unprecedented nature of Ashcroft's alleged material witness policy, and thus it is unsurprising that published cases directly on point are lacking. However, this alone is not enough to give Ashcroft immunity: " 'while there may be no published cases holding similar policies [un]constitutional, this may be due more to the obviousness of the illegality than the novelty of the legal issue.' " *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) (quoting *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002)). Indeed, as the Supreme Court has stated:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope*, 536 U.S. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal citations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741.

What *was* clearly established in March 2003? No federal appellate court had yet squarely held that the federal material witness statute satisfied the requirements of the Fourth Amendment. Even our decision in *Bacon* held only that it was unconstitutional as applied to the petitioner. 449 F.2d at 943.

What *obiter dicta* existed on material witness detention, however, clearly linked its justification only to the state's overriding need to compel testimony in criminal cases.[21] Even dicta, if sufficiently clear, can suffice to "clearly establish" a constitutional right. *See Hope*, 536 U.S. at 740-41. But there is more.

[13] The definition of probable cause, as set forth in *Beck v. Ohio*, was certainly clearly established. While the Supreme Court's decision *permitting* suspicionless seizures in some circumstances in *Lidster* had not yet been decided, its decision in *Edmond*, stating that an investigatory programmatic purpose renders a program of seizures without probable cause unconstitutional, had been decided two and a half years earlier. 531 U.S. at 47. That holding was reaffirmed the following year in *Ferguson*, 532 U.S. at 81-83, which highlighted the close connection between the investigative "programmatic purpose" and the search scheme that was ruled unconstitutional. Those decisions, which emphasized that an investigatory programmatic purpose would invalidate a scheme of searches and seizures without probable cause, should have been sufficient to put Ashcroft on notice that the material witness detentions—involving a far more severe seizure than a

---

[21] *See, e.g.*, *Stein*, 346 U.S. at 184 (1953) ("The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness."); *Barry*, 279 U.S. at 617 (stating that the material witness statute then in effect "provides that any federal judge . . . may have [material witnesses] brought before him by a warrant of arrest, to give recognizance, and that such person may be confined until removed *for the purpose of giving his testimony*") (emphasis added); *Bacon*, 449 F.2d at 942 ("The public interest [in detaining witnesses] will be protected if grand jury witnesses come forth to provide testimony concerning the possible commission of crimes."); *Awadallah I*, 202 F. Supp. 2d at 77 ("The only *legitimate* reason to detain a grand jury witness is to aid in 'an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.' " (quoting *United States v. Calandra*, 414 U.S. 338, 343-44 (1974))).

mere traffic stop—would be similarly subject to an inquiry into programmatic purpose.

Moreover, the history and purposes of the Fourth Amendment were known well before 2003:

> The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. "The requirement of probable cause has roots that are deep in our history." Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that "common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest."

*Dunaway v. New York*, 442 U.S. 200, 213 (1979) (quoting *Henry v. United States*, 361 U.S. 98, 100-01 (1959)) (internal citation omitted). The Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

The facts alleged of al-Kidd's arrest, that he was arrested because he was associated with the webmaster of an allegedly jihadist website, demonstrate the continued relevance of the Founders' concerns. The Fourth Amendment was, in large measure, a direct response to the so-called "Wilkes cases." As summarized by the Supreme Court:

> The *Wilkes* case arose out of the Crown's attempt to stifle a publication called The North Briton, anonymously published by John Wilkes, then a member of Parliament—particularly issue No. 45 of that journal.

Lord Halifax, as Secretary of State, issued a warrant ordering four of the King's messengers "to make strict and diligent search for the authors, printers, and publishers of a seditious and treasonable paper, entitled, The North Briton, No. 45, * * * and them, or any of them, having found, to apprehend and seize, together with their papers." "Armed with their roving commission, they set forth in quest of unknown offenders; and unable to take evidence, listened to rumors, idle tales, and curious guesses. They held in their hands the liberty of every man whom they were pleased to suspect." Holding that this was "a ridiculous warrant against the whole English nation," the Court of Common Pleas awarded Wilkes damages against the Secretary of State.

*Id.* at 483 (alteration in original) (footnotes omitted). Within three days of the issuance of Halifax's general warrants, forty-nine people had been arrested, none of whom was named in the warrant, but all of whom were alleged associates of the allegedly seditious pamphleteer. Nelson B. Lasson, *The Fourth Amendment to the Constitution* 43-44 (1937). The warrant authorizing al-Kidd named him in particular, and so was not a general warrant in that sense. But the result was the same: gutting the substantive protections of the Fourth Amendment's "probable cause" requirement and giving the state the power to arrest upon the executive's mere suspicion.

Finally, months before al-Kidd's arrest, one district court in a high-profile case had already indicated, in the spring of 2002, that *§ 3144 itself* should not be abused as an investigatory anti-terrorism tool, calling out Ashcroft by name:

Other reasons may motivate prosecutors and law enforcement officers to rely upon the material witness statute. Attorney General John Ashcroft has been reported as saying: "Aggressive detention of

> lawbreakers and material witnesses is vital to pre-
> venting, disrupting or delaying new attacks." *Relying
> on the material witness statute to detain people who
> are presumed innocent under our Constitution in
> order to prevent potential crimes is an illegitimate
> use of the statute.* If there is probable cause to
> believe an individual has committed a crime or is
> conspiring to commit a crime, then the government
> may lawfully arrest that person, but only upon *such*
> a showing.

*Awadallah I*, 202 F. Supp. 2d at 77 n.28 (citation omitted, first emphasis added). The statement was dicta in a footnote of a district court opinion. But it was categorical, and it addressed *exactly* what al-Kidd alleges happened ten months after the opinion was first issued. It is difficult to imagine what, in early 2003,[22] might have given John Ashcroft "fair-[er] warning" that he could be haled into court for his alleged material witness policies. *Hope*, 536 U.S. at 741.

**[14]** We therefore hold that al-Kidd's right not to be arrested as a material witness in order to be investigated or preemptively detained was clearly established in 2003. Although Ashcroft has raised in this appeal neither a national security nor an exigency defense to al-Kidd's action, we note that we are mindful of the pressures under which the Attorney General must operate. We do not intend to "dampen the ardor of all but the most resolute, or the most irresponsible, in the

---

[22]Mr. Awadallah was detained shortly after the September 11 attacks. *Awadallah II*, 349 F.3d at 45 (Sept. 20, 2001). He sought his release almost immediately. *Id.* at 47 (Sept. 25, 2001). By April of 2003, his case had finally reached the court of appeals. Given the speed of our appellate process, it would have been almost impossible for any authority higher than a district court to have opined on defendant's material witness policies before March 2003. As noted above, the Second Circuit later indicated, in dicta of its own, its agreement with the district court's statement on this question, even as it reversed the district court's holding and remanded the case. *Id.* at 59.

unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949). But, as the Supreme Court has aptly noted, qualified immunity must

> not allow the Attorney General to carry out his national security functions wholly free from concern for his personal liability; he may on occasion have to pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States. But this is precisely the point of the *Harlow* standard: "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate . . . ." This is as true in matters of national security as in other fields of governmental action. We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.

*Mitchell*, 472 U.S. at 524 (quoting *Harlow*, 457 U.S. at 819) (internal citations omitted).

### 4. The § 3144 Claim

In addition to alleging that Ashcroft misused § 3144 for unconstitutional purposes the statute did not intend, al-Kidd alleges that his arrest violated the terms of § 3144 itself. Section 3144 authorizes the arrest of material witnesses only if (1) "the testimony of a person is material in a criminal proceeding," and (2) "it may become impracticable to secure the presence of the person by subpoena." *Bacon v. United States* requires that these elements be shown by presenting the judicial officer with an affidavit showing "the underlying facts or circumstances from which the judicial officer could find probable cause." 449 F.2d at 943. Al-Kidd claims that, in his case, the Mace Affidavit fails to demonstrate probable cause for either the materiality of his testimony or the reasons it would be impracticable to secure that testimony by subpoena. This

allegation is the § 3144 claim: that, independent of the constitutionality of the use of § 3144 for investigatory purposes, al-Kidd's arrest failed to meet the statutory requirements set forth by Congress, and was therefore unlawful.

**Volume 2 of 2**

Although the arrest was conducted pursuant to a warrant issued by a magistrate judge, we allow challenges to the validity of searches and seizures conducted pursuant to a warrant if the affidavit in support of the warrant included false statements or material omissions that were made intentionally or recklessly. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) (extending *Franks* to material omissions); *see also Awadallah I*, 349 F.3d at 64-65 & n.17 (assuming, without deciding, that *Franks* applies to a material witness warrants and conducting the *Franks* analysis). Ashcroft does not contest that such an inquiry would be appropriate, or that reckless or intentional misstatements or omissions could, if proven, constitute a valid claim of the violation of a clearly established right. Rather, he argues that al-Kidd has not pled sufficient acts or omissions to establish supervisory liability for the § 3144 Claim.[23]

Prior to *Bell Atlantic Company v. Twombly*, 550 U.S. 544, we held that a plaintiff "does not need to show with great specificity how each defendant contributed to the violation of his constitutional rights. Rather, he must state the allegations generally so as to provide notice to the defendants and alert the court as to what conduct violated clearly established law." *Preschooler II*, 479 F.3d at 1182. Ashcroft argues that al-Kidd's allegations as to Ashcroft's personal involvement in the § 3144 Claim amount simply to "sheer speculation," and are insufficient to state a claim under *Twombly*.

In *Twombly*, the Supreme Court held that an allegation of parallel conduct by competitors, without more, does not suffice to plead an antitrust violation under 15 U.S.C. § 1. 550 U.S. at 548. While the Court expressly disclaimed any inten-

---

[23]As discussed previously, "a plaintiff must plead that each Government-official defendant, though the official's own individual actions" were involved in the constitutional deprivations. *Iqbal*, 129 S. Ct. at 1948.

tion to require general "heightened fact pleading of specifics," *id.* at 570, and reaffirmed the holding of *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (rejecting a fact pleading requirement for Title VII employment discrimination), it stated that, to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must aver "enough facts to state a claim to relief that is plausible on its face," *id.* at 570.

Since the argument and initial briefing in this case, the Supreme Court, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), has clarified *Twombly*'s reach to cases such as these. *Iqbal* concerned claims against a number of defendants, including FBI Director Mueller and Attorney General Ashcroft, made by Javaid Iqbal, a Muslim Pakistani who was part of the mass roundup of Muslim aliens on immigration charges following the September 11 attacks. Iqbal claimed that Mueller and Ashcroft were responsible for selectively placing detainees in their restrictive conditions on account of their race and religion. *Id.* at 1951. The Supreme Court found the allegations in the complaint insufficient to state a discrimination claim under the above-discussed *Twombly* "plausibility" standard. *Id.* at 1952. The Court held that a pleading "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' " is insufficient to state a claim under Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555).

In reviewing the complaint in *Iqbal*, the Court noted that the complaint did not contain any factual allegations claiming that Mueller or Ashcroft may have intentionally discriminated on the basis of race or religion. *Id.* at 1952 ("Accepting the truth of [the allegation of a adopting an impermissible policy], the complaint does not show, or even intimate, that petitioners purposefully housed detainees . . . due to their race, religion, or national origin."). The Court concluded that bare assertions regarding an invidious policy were not entitled to the assumption of truth because they amounted to "nothing more than a 'formulaic recitation of the elements' of a constitutional dis-

crimination claim." *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 555). The Court noted that the alleged facts, even if accepted as true, were more compatible on their face with lawful conduct. *Id.*

[15] Here, unlike Iqbal's allegations, al-Kidd's complaint "plausibly suggest[s]" unlawful conduct, and does more than contain bare allegations of an impermissible policy. *Id.* at 1950. While the complaint similarly alleges that Ashcroft is the "principal architect" of the policy, the complaint in this case contains specific statements that Ashcroft himself made regarding the post-September 11th use of the material witness statute. Ashcroft stated that enhanced tactics, such as the use of the material witness statute, "form one part of the department's concentrated strategy to prevent terrorist attacks by taking suspected terrorists off the street," and that "[a]ggressive detention of lawbreakers and material witnesses is vital to preventing, disrupting or delaying new attacks." Other top DOJ officials candidly admitted that the material witness statute was viewed as an important "investigative tool" where they could obtain "evidence" about the witness. The complaint also contains reference to congressional testimony from FBI Director Mueller, stating that al-Kidd's arrest was one of the government's anti-terrorism successes— without any caveat that al-Kidd was arrested only as a witness. Comparatively, Iqbal's complaint contained no factual allegations detailing statements made by Muller and Ashcroft regarding discrimination. The specific allegations in al-Kidd's complaint plausibly suggest something more than just bare allegations of improper purpose; they demonstrate that the Attorney General purposefully used the material witness statute to detain suspects whom he wished to investigate and detain preventatively, and that al-Kidd was subjected to this policy.

Further, unlike in *Twombly* and *Iqbal*, where the plaintiffs alleged a conspiracy or discriminatory practice in the most conclusory terms, al-Kidd does not rely *solely* on his assertion

that Ashcroft ordered, encouraged, or permitted "policies and practices [whereby] individuals have also been impermissibly arrested and detained as material witnesses even though there was no reason to believe it would have been practicable to secure their testimony voluntarily or by subpoena."[24] His complaint notes "one account" of material witness practices stating that "nearly fifty percent of those detained in connection with post-9/11 terrorism investigations were not called to testify." In a declaration filed in another proceeding well before al-Kidd's arrest, a DOJ official admitted that, of those detained as material witnesses, "it may turn out that these individuals have no information useful to the investigation." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 942 (D.C. Cir. 2003) (Tatel, J., dissenting) (quoting Declaration of James Reynolds, Chief of the Terrorism and Violent Crime Section, Criminal Division, Dep't of Justice).

Al-Kidd need not show that Ashcroft "actually instruct[ed] his subordinates to bypass the plain text of the statute," as Ashcroft contends. The complaint clearly alleges facts which might support liability on the basis of Ashcroft's *knowing failure* to act in the light of even unauthorized abuses, but also alleges facts which may support liability on the basis that Ashcroft purposely used the material witness statute to preventatively detain suspects and that al-Kidd was subjected to this policy.[25] As discussed above, Ashcroft publically stated

---

[24]Ashcroft contends that al-Kidd does not even go so far as to make such an assertion, and that he never explicitly says in his complaint that Ashcroft designed such a policy. This argument requires a hypertechnical reading of the complaint. The paragraph alleging outright violations of § 3144 begins with "*the* post-9/11 policies and practices," with the definite article. (Emphasis added). There is no reason from the text of the complaint to think that *those* "post-9/11 policies and practices" are anything other than "*The* post-9/11 material witness policies and practices *adopted and implemented by Defendant Ashcroft*" alleged fourteen paragraphs earlier in the complaint. (Emphasis added).

[25]The dissent contends that the "knowing failure to act" standard did not survive *Iqbal*. Dissent at 12345 n.13. The dissent points to the fact that the

that the material witness statute was an important tool in "taking suspected terrorists off the street," and that "[a]ggressive detention of . . . material witnesses is vital to preventing, disrupting or delaying new attacks." Again, unlike in *Iqbal*, these are not bare allegations that the Attorney General "knew of" the policy. Here, the complaint contains allegations that plausibly suggest that Ashcroft purposely instructed his subordinates to bypass the plain reading of the statute.[26] "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). Here, the allegations recounted above clearly "nudge[ ]" al-Kidd's claim of illegality "across the line from conceivable to plausible." *Id.* at 1952 (citing *Twombly*, 550 U.S. at 570).

Further, the complaint notes that the "abuses occurring under the material witness statute after September 11, 2001, were highly publicized in the media, congressional testimony and correspondence, and in various reports by governmental and non-governmental entities," which could have given Ashcroft sufficient notice to require affirmative acts to supervise and correct the actions of his subordinates. The complaint also

Court held that Ashcroft could not be held liable for his "knowledge and acquiescence" of his subordinates' unconstitutional discrimination against Muslim men. 129 S.Ct. at 1948. We need not address whether the two standards are distinct, or whether the Court's comments relate solely to discrimination claims which have an intent element, because al-Kidd plausibly pleads "purpose" rather than just "knowledge" to impose liability on Ashcroft. *Id.* at 1949 ("[P]urpose rather than knowledge is required to impose *Bivens* liability . . . for an official charged with violations arising from his or her superintendent responsibilities.").

[26]The dissent believes that al-Kidd's complaint plausibly demonstrates only that Ashcroft directed his subordinates to use the statute "pretextually," not "unlawfully." Dissent at 12348. As discussed above, the pretextual use of the material witness statute that results in a person being detained for criminal investigation without adequate probable cause runs afoul of the Fourth Amendment, and is thus unlawful.

avers that "the Justice Department has issued apologies to 10-12 individuals who were improperly arrested as material witnesses." Given that the government maintains that it does nothing wrong in the pretextual use of the material witness statute to investigate and preemptively detain, it is reasonable to infer that its apologies were for violations of the terms of the statute itself, of which the DOJ, and presumably its leader, were aware.[27] The complaint also contains extensive citations to the OIG Report, which discussed at length abuses and improprieties that occurred in a related context, involving investigatory detention of aliens. While the OIG Report was not released to the public until April 2003, it is reasonable to believe that Ashcroft, as Attorney General, would have been aware of its contents at a date preceding al-Kidd's arrest.

Our dissenting colleague contends that al-Kidd's pleadings merely establish that "some material witnesses were detained who did not testify or did not prove to have material information," perhaps because defendants took plea deals or prosecutors acted hastily in conducting investigations. Dissent at 12347. The dissent further contends that this does not amount to a *Franks* violation. *Franks*, 438 U.S. at 165. As discussed above, al-Kidd pleads facts that go much farther than merely showing that he was detained under the material witness statute and did not testify. The pleadings show that Ashcroft explicitly stated that enhanced techniques such as the use of the material witness statute "form one part of the department's concentrated strategy to prevent terrorist attacks by taking suspected terrorists off the street." Other top DOJ officials stated that the material witness statute was viewed as an important "investigative tool," and that al-Kidd's arrest was touted as one of the government's anti-terrorism successes, without any mention that he was being held as a material wit-

---

[27]To be sure, this is not a *necessary* inference: the apologies could have been for wrongs that do not rise to the level of a constitutional violation. But neither is it an *unreasonable* inference, and on a Rule 12(b)(6) motion, we draw all reasonable inferences in favor of the plaintiff.

ness. We disagree with the dissent, and hold that al-Kidd has plead that Ashcroft's "concerted strategy" of misusing the material witness statute plausibly led to al-Kidd's detention.

Post-*Twombly*, plaintiffs face a higher burden of pleading facts, and courts face greater uncertainty in evaluating complaints. As discussed in *Iqbal*, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. This concern applied with great force in the civil rights context, where "[t]he basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.' " *Id.* at 1953 (citing *Siegert v. Gilley*, 500 U.S. 226, 236 (1991)). Drawing on our "judicial experience and common sense," as the Supreme Court urges us to do, we find that al-Kidd has met his burden of pleading a claim for relief that is plausible, and that his suit on the § 3144 claim should be allowed to proceed. *Id.* at 1950.

**[16]** Were this case before us on summary judgment, and were the facts pled in the complaint the only ones in the record, our decision might well be different. In the district court, moving forward, al-Kidd will bear a significant burden to show that the Attorney General himself was personally involved in a policy or practice of alleged violations of § 3144. But *Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden. "Asking for plausible grounds to infer" the existence of a claim for relief "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to prove that claim. *Twombly,* 550 U.S. at 556. In this case, we hold that al-Kidd has pled "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

### 5. Conditions of Confinement Claim

Lastly, al-Kidd complains that he was mistreated while confined as a material witness. Confinement of criminals is a punishment, and, within the limits of the Fifth and Eighth Amendments, it is supposed to be unpleasant. However, when, as here, the government is empowered to detain those who are not charged with crimes, it is under an obligation not to treat them like criminals. *See Youngsberg v. Romeo*, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). Prior to 2003, at least two district courts had refused, on constitutional grounds, to house material witness detainees under the same conditions as those facing trial. *See United States v. Nai*, 949 F. Supp. 42, 46 (D. Mass. 1996) (expressing "concern[ ] that these five material witnesses are being treated as if they were charged with an offense" and ordering them "transferred to a minimum security, residential facility"); *In re Cochrane*, 434 F. Supp. 1207, 1215 (D. Neb. 1977) (holding that "a witness who has had, at most, the misfortune of seeing a crime committed" must be held in "the least restrictive alternative that is reasonably calculated to assure the witness' presence for trial").

On this appeal, Ashcroft contests neither the substance of the right al-Kidd claims was violated in the Conditions of Confinement Claim, nor whether that right was "clearly established." Rather, as with the § 3144 Claim, he argues only that al-Kidd has failed to plead sufficient facts to tie Ashcroft, personally, to the alleged violation.

**[17]** The unconstitutional conditions claim in this case is substantially similar to the claims in the Supreme Court's recent *Iqbal* decision. In *Iqbal*, the complaint alleged Ashcroft's liability for the conditions of confinement at the Metropolitan Detention Center in New York, where aliens

arrested after 9/11 were held. 129 S. Ct. at 1944. Iqbal's complaint alleged that Ashcroft and FBI Director Robert Mueller approved of these highly restrictive detention policies in discussions that took place in the weeks after September 11, 2001. *Id.* at 1951. Similarly, al-Kidd claims here that Ashcroft promulgated and approved the unlawful policy which caused al-Kidd "to be subjected to prolonged, excessive, punitive, harsh, unreasonable detention or post-release conditions." Contrary to the § 3144 claim, however, the complaint does not allege any specific facts—such as statements from Ashcroft or from high ranking officials in the DOJ—establishing that Ashcroft had personal involvement in setting the conditions of confinement.

As al-Kidd's complaint notes, media reports had observed the conditions detailed in the OIG Report to apply to Americans and legal aliens held as material witnesses. *See, e.g.*, Naftali Bendavid, *Material Witness Arrests Under Fire; Dozens Detained in War on Terror*, Chi. Trib., Dec. 24, 2001, at N1; Fainaru & Williams, *supra*, at A1; John Riley, *Held Without Charge: Material Witness Law Puts Detainees in Legal Limbo*, N.Y. Newsday, Sept. 18, 2002, at A6. Their conditions of confinement had also been noted by the courts. The district court in *Awadallah I*, writing in the spring of 2002, decried at length the state in which Mr. Awadallah had been held:

> Awadallah was treated as a high security federal prisoner. Having committed no crime—indeed, without any claim that there was probable cause to believe he had violated any law—Awadallah bore the full weight of a prison system designed to punish convicted criminals as well as incapacitate individuals arrested or indicted for criminal conduct.
>
> . . . In many ways, . . . the conditions of his confinement were more restrictive than that experienced by the general prison population.

202 F. Supp. 2d at 60; *see id.* at 60-61 & nn.5-10 (describing Awadallah's allegations of mistreatment while in custody). While it is possible that these reports were sufficient to put Ashcroft on notice by spring of 2003 that there was a systemic problem at the DOJ with respect to its treatment of material witnesses, the non-specific allegations in the complaint regarding Ashcroft's involvement fail to nudge the *possible* to the *plausible*, as required by *Twombly*.

**[18]** Unlike the § 3144 Claim, which specifically avers facts which could sustain the inference that Ashcroft "set[ ] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury" regarding the illegal use of the material witness statute, *Kwai Fun Wong*, 373 F.3d at 966 (internal quotation marks omitted), the complaint's more conclusory allegations regarding Ashcroft's involvement in setting the harsh conditions of confinement (which are very similar to the allegations in *Iqbal*), are deficient under Rule 8. Accordingly, we reverse the district court on al-Kidd's Conditions of Confinement claim, and hold that al-Kidd has not alleged adequate facts to render plausible Ashcroft's personal involvement in setting the harsh conditions of his confinement, and has therefore failed to state a claim for which relief can be granted.

## C.   **Personal Jurisdiction**

Finally, Ashcroft contends that the district court erred in denying Ashcroft's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. As this is an interlocutory appeal, we will address the issue only to the extent it falls within our pendent appellate jurisdiction.

### 1.   *"Necessary to Provide Meaningful Review"*

Ashcroft first alleges that the issue of personal jurisdiction is "necessary to provide meaningful review" of the district

court's immunity rulings. It is true that personal jurisdiction was a necessary predicate to the district court's Rule 12(b)(6) ruling denying Ashcroft absolute and qualified immunity. But that could be said about *any* ruling following a decision on personal jurisdiction, so that alone cannot make our review of personal jurisdiction "necessary to provide meaningful review." *See, e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671-72 (9th Cir. 2004) (holding that personal jurisdiction not "necessary to ensure meaningful review" of class certification); *see also Rux v. Republic of Sudan*, 461 F.3d 461, 475-76 (4th Cir. 2006) (same with respect to review of subject matter jurisdiction under FISA); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*, 269 F.3d 187, 204-05 (3d Cir. 2001) (same with respect to review of motion to compel arbitration).

The only cases that Ashcroft cites to suggest that personal jurisdiction is necessary to ensure meaningful review are cases involving interlocutory appeals of temporary injunctions. *Hendricks*, 408 F.3d at 1134-35; *In re Diet Drugs*, 282 F.3d 220, 230 n.5 (3d Cir. 2002). In entering a preliminary injunction, however, a district court has already necessarily found "at least a reasonable probability of ultimate success upon the question of jurisdiction." *Visual Scis., Inc. v. Integrated Comm., Inc.*, 660 F.2d 56, 59 (2d Cir. 1981) (citation and quotation marks omitted). To rule on the preliminary injunction is necessarily to make a judgment as to the question of jurisdiction. More importantly, the equitable remedy of injunction, granted before trial, is itself an imposition on the defendant that goes well beyond merely being haled into court, and often effectively decides the issue in question. *See Dupont*, 269 F.3d at 205 n.9 (distinguishing a precedent involving a permanent injunction because "[i]t is well-settled that when a court grants an injunction, the underlying personal jurisdiction decision is immediately reviewable on appeal").

## 2.   *"Inextricably Intertwined"*

Ashcroft next argues that the issue of personal jurisdiction is "inextricably intertwined" with the immunity issues. To be "inextricably intertwined," we "require that the two issues: (a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003) (internal quotation marks and alterations omitted). The first criterion fails: unlike, for example, the temporary injunction, where success on the merits, including on the issue of personal jurisdiction, is an element of the issue being appealed, personal jurisdiction is not a subset of qualified immunity and we need not necessarily address the former to resolve the latter. *Cf. id.* ("We can decide the anti-SLAPP issue entirely independently of the question of personal jurisdiction, and different legal standards apply to each issue.").

**[19]** The second criterion, however, is present—in part. To obtain specific personal jurisdiction over a defendant in a state, the defendant must either purposefully avail himself of the privilege of conducting activities in the state, or purposefully direct his activities toward the state. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Purposeful direction, in turn, requires that the defendant have (1) committed an "intentional act," (2) "expressly aimed" at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Id.* at 805. The first element, an intentional act, is effectively decided by resolution of the "personal involvement" prong of the qualified immunity inquiry. Insofar as Ashcroft's objection to personal jurisdiction rests on the absence of an intentional act, we affirm the decision of the district court to exercise personal jurisdiction.

**[20]** Insofar as Ashcroft's objection to personal jurisdiction rests on the fact that his acts were not "expressly aimed" at

Idaho, or that he did not know that his acts were likely to cause harm in Idaho, we decline to rule on the issue. Far from being "inextricably intertwined," those issues are irrelevant to any element of absolute or qualified immunity. The federal courts of appeals are courts of limited jurisdiction, and Congress has not seen fit to give this court the general power to review district courts' exercise of personal jurisdiction before a final judgment. We therefore will not do so here.

## CONCLUSION

Almost two and a half centuries ago, William Blackstone, considered by many to be the preeminent pre-Revolutionary War authority on the common law, wrote:

> To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom. But confinement of the person, by secretly hurrying him to gaol, where his sufferings are unknown or forgotten; is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 131-32 (1765). The Fourth Amendment was written and ratified, in part, to deny the government of our then-new nation such an engine of potential tyranny. And yet, if the facts alleged in al-Kidd's complaint are actually true, the government has recently exercised such a "dangerous engine of arbitrary government" against a significant number of its citizens, and given good reason for disfavored minorities (whoever they may be from time to time) to fear the application of such arbitrary power to them.

We are confident that, in light of the experience of the American colonists with the abuses of the British Crown, the

Framers of our Constitution would have disapproved of the arrest, detention, and harsh confinement of a United States citizen as a "material witness" under the circumstances, and for the immediate purpose alleged, in al-Kidd's complaint. Sadly, however, even now, more than 217 years after the ratification of the Fourth Amendment to the Constitution, some confidently assert that the government has the power to arrest and detain or restrict American citizens for months on end, in sometimes primitive conditions, not because there is evidence that they have committed a crime, but merely because the government wishes to investigate them for possible wrongdoing, or to prevent them from having contact with others in the outside world. We find this to be repugnant to the Constitution, and a painful reminder of some of the most ignominious chapters of our national history.

For the reasons indicated in this opinion, we **AFFIRM** in part and **REVERSE** in part the decision of the district court. Each party shall bear its own costs on appeal.

---

BEA, Circuit Judge, concurring in part and dissenting in part:

This case raises the question whether a person whom a prosecutor can *rightly* arrest under a statute becomes *wrongly* arrested if the prosecutor's purpose in arresting him had nothing to do with the statute. Put another way, can a prosecutor, empowered by law to arrest an individual for one declared purpose, be immune from suit when he arrests that person with another, secret purpose in mind?

Our natural reaction is, "Of course not!" Such a prosecutor is abusing the vast discretionary powers we have entrusted to him. He is not playing fair; he is playing "Gotcha!"

But under our law, that natural reaction would be wrong. For reasons of public policy, our law provides the prosecutor with official immunity—perhaps not immunity from being fired, impeached, or hounded from public life, but immunity nonetheless—from lawsuits for money damages based on the acts he undertakes on behalf of the public.

The Supreme Court has developed this law by repeatedly instructing us not to inquire into the personal, subjective intentions of a government official when determining whether the official is protected by official immunity. Reading the minds of government officials is notoriously expensive, uncertain, and fraught with error. The very purpose of official immunity is to shield the purses of government officials from the high costs of civil damages lawsuits. If official immunity were to depend upon proof of the officials' good intentions, the value of that immunity would be lost.

Yet today, the majority permits plaintiff Abdullah al-Kidd to seek redress from the wallet of a federal cabinet-level official for injuries al-Kidd alleges he suffered when he was detained—pursuant to a warrant signed and issued by a neutral federal magistrate judge—as a material witness in the government's prosecution of an indicted terrorist suspect.

The sole reason the majority provides for stripping former Attorney General John Ashcroft of his official immunity is that, although he and his subordinates had sufficient evidence to arrest al-Kidd as a material witness in the prosecution of a suspected terrorist under the applicable statute, they acted with a forbidden state of mind: they *really* arrested him not to testify against the indicted terror suspect, but to investigate al-Kidd himself.

Because I do not believe this holding comports with the Supreme Court's instructions regarding official immunity and Fourth Amendment law, I must respectfully dissent.

I also dissent from the majority's resolution of al-Kidd's claim that Ashcroft is personally liable for the inclusion of claimed material misrepresentations and omissions in the affidavit supporting the material witness warrant on which al-Kidd was detained. Al-Kidd's complaint does not state facts sufficient plausibly to show Ashcroft was personally responsible for the claimed falsities. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

## I.   Background

After 9/11, in connection with an investigation into terrorist activities in Idaho, federal agents interviewed al-Kidd on several occasions. In February 2003, a grand jury returned an indictment against Sami Omar Al-Hussayen, a suspect in that investigation. During the course of the investigation, FBI agents learned, and later affied, that al-Kidd had received "in excess" of $20,000 from Al-Hussayen, had met with Al-Hussayen's associates after al-Kidd's trip to Yemen, and had contacts with the Islamic Assembly of North America ("IANA") (the suspected Jihadist organization for which Al-Hussayen worked).[1] One month later, al-Kidd purchased a plane ticket to Saudi Arabia. Apprehensive, they said, that al-Kidd would abscond to Saudi Arabia with information critical to the prosecution of al Hussayen, never to return, the federal agents sought a warrant for his arrest. The agents appeared before a magistrate, swore they had good cause to believe al-Kidd both had information material to Al-Hussayen's prosecution and was on the run, and then arrested al-Kidd at Dulles International Airport as he was about to board a plane to

---

[1]As the majority states, the Al-Hussayen indictment alleged that one of the IANA's purposes was "indoctrination, recruitment of members, and the instigation of acts of violence and terrorism." The Al-Hussayen indictment also alleged Al-Hussayen himself was the sole registrant of another website, www.alasr.ws, which was affiliated with the IANA's website through a third website belonging to the IANA. The www.alasr.ws website published an article in June 2001 entitled "Provision of Suicide Operations," which advocated suicide bombings and "bringing down" aircraft.

Saudi Arabia. The government held al-Kidd for fourteen days and released him only when al-Kidd surrendered his passport and agreed to certain conditions of release. In the event, al-Kidd was never called to testify at al-Hussayen's trial.

Al-Kidd filed this action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), in the United States District Court for the District of Idaho. Al-Kidd named as defendants not only the officers who prepared the material witness warrant, but former Attorney General Ashcroft, FBI Director Robert Mueller, and former Secretary of the Department of Homeland Security Michael Chertoff, as well as the wardens of the prisons in which he was detained. In his complaint, al-Kidd raises three very distinct claims. First, al-Kidd alleges that the conditions under which he was confined were unconstitutionally harsh. Second, al-Kidd alleges his detention on a material witness warrant was illegal because it was based on pure pretext; the government wanted to detain al-Kidd not to secure his testimony at the Al-Hussayen trial but really to keep al-Kidd himself off the streets and to investigate him. Al-Kidd contends that even if the warrant on which he was detained was objectively valid, the preparing officers' subjective intention to use the warrant to accomplish an illicit goal rendered the officers' actions unconstitutional. Third, al-Kidd contends the warrant was not only illegal because it was pretextual, it was also invalid because it was based on an affidavit containing material misrepresentations and omissions: Al-Kidd had no information useful to the investigation, he was not a flight risk, and the government knew it but concealed those facts from the magistrate.

Ashcroft contends each of these claims is barred, either because al-Kidd has not pleaded facts sufficient to establish Ashcroft's personal involvement; because Ashcroft enjoys absolute or qualified immunity against al-Kidd's claims; or, because the district court lacked personal jurisdiction over Ashcroft.

The majority concludes that al-Kidd has not adequately pleaded Ashcroft's personal involvement in the decision to subject him to unconstitutionally harsh conditions of confinement. I agree, and therefore I join in Part B.5 of the majority opinion ("The Conditions of Confinement Claim").

As to al-Kidd's second and third claims, however, the majority affirms the district court's order denying Ashcroft's motion to dismiss.

I disagree. As to al-Kidd's claim prosecutors used the material witness statute as a pretext to pursue other, investigatory or crime prevention agendas, the answer is simply that such pretext does not invalidate the arrest warrant; I would hold Ashcroft is shielded by qualified immunity. In light of the considerable authority recognizing that the pretextual use of an objectively justifiable search or seizure does not violate the Fourth Amendment, it follows the federal agents did not violate al-Kidd's constitutional rights. But if I'm wrong, in any case al-Kidd's right not to be arrested on an objectively valid, but pretextual arrest warrant was not "clearly established" in March 2003, when al-Kidd was detained, and qualified immunity therefore shields Ashcroft from al-Kidd's claims. *See Saucier v. Katz*, 533 U.S. 194 (2001). I therefore dissent from part B.3 of the majority opinion ("The Fourth Amendment Claim").

As to al-Kidd's claim that his detention violated the Fourth Amendment and the terms of the material witness statute because the supporting warrant application contained material misrepresentations and omissions, we cannot reach the merits of his claim, for—as with his claim that Ashcroft is liable for the claimed wretched conditions of al-Kidd's confinement, as to which all of us agree his claim fails—al-Kidd has failed to allege facts sufficient to establish Ashcroft's personal liability for such conduct. *See Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937 (2009). Therefore I dissent from part B.4 of the majority opinion.

Lastly, I disagree, in part, with the majority's treatment of Ashcroft's claim of absolute immunity. I agree that Ashcroft lacks absolute prosecutorial immunity for his acts or omissions in supervising the officers who acted as complaining witnesses in support of a material witness warrant application. When officials—whether prosecutors or police officers—act as mere witnesses in support of a warrant application, absolute immunity does not shield their actions. Equally, Ashcroft would lack absolute immunity for his acts or omissions in supervising officers who obtain a material witness warrant to secure the presence of a witness before an investigatory grand jury, rather than a criminal trial. However, I disagree that Ashcroft does not enjoy absolute immunity for his supervision of prosecutors who decide to seek a material witness warrant to secure the presence of a witness at a criminal trial, regardless of any claimed improper motive.[2]

I address each of these issues in turn.

## II.    Qualified Immunity

I would hold that Ashcroft enjoys qualified immunity from al-Kidd's claim that the material witness warrant on which he was detained was merely a pretext to accomplish other law enforcement objectives. To be clear, al-Kidd's *pretext* claim is not that the material witness warrant on which he was detained was invalid on its face or because it was based on an affidavit containing material misrepresentations or omissions.[3]

---

[2]I express no opinion as to parts B.1 ("Qualified Immunity Generally") and B.2 ("Qualified Immunity for Supervisors"). I also express no opinion as to part C ("Personal Jurisdiction"). Because I conclude al-Kidd cannot proceed on his claims against Ashcroft, I would not reach the difficult question whether this court has pendent appellate jurisdiction over Ashcroft's appeal of the district court's order denying his motion to dismiss al-Kidd's claims against him for lack of personal jurisdiction. If it is not necessary to decide an issue, it is necessary for a common-law court not to decide it.

[3]Al-Kidd later makes this claim separate and distinct from his pretext claim. It is addressed *infra*, parts III and IV.

Rather, in his pretext claim, al-Kidd contends that *even if* the material witness warrant on which he was detained was objectively valid and supported by probable cause, the prosecutor's subjective intention to use the material witness warrant to accomplish other, law-enforcement objectives renders the government's conduct unconstitutional. Because al-Kidd had no constitutional right to be free from such conduct—and certainly had no *clearly established* constitutional right—I dissent from the majority's conclusion that Ashcroft lacks qualified immunity.

Al-Kidd bases his claims of liberty from arrest on the Fourth Amendment. The Supreme Court has repeatedly stated that under the Fourth Amendment, an officer's subjective intentions are irrelevant so long as the officer's conduct is objectively justified. *See, e.g., Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." (internal citations and quotation marks omitted));[4] *Scott v. United States*, 436 U.S. 128, 136-37 (1978) ("Subjective intent alone, the Government contends, does not make otherwise lawful conduct illegal or unconstitutional. We think the Government's position, which also served as the basis for decision in the Court of Appeals,

---

[4]In *Macon*, an undercover police officer purchased pornographic materials from a bookstore. The officer left the bookstore, consulted with fellow officers, and, upon concluding the book was pornographic, returned to the bookstore and arrested the storekeeper and seized the marked bill the officer used to purchase the book. The Supreme Court held that the purchase, in a voluntary transaction, of wares by an undercover officer is not a search within the meaning of the Fourth Amendment. *Id.* at 469. The storekeeper contended the officer's subjective intention to retrieve the marked $50 bill transformed the sale into a search. *Id.* at 469-70. The Supreme Court disagreed and held that because the transaction, objectively viewed, was a sale in the ordinary course of business, the sale did not constitute a search. *Id.*

embodies the proper approach for evaluating compliance with the minimization requirement [relating to wiretaps].");**5** *United States v. Robinson*, 414 U.S. 218, 236 (1973) (holding that an officer's objectively lawful search incident to arrest was lawful though officer lacked the subjective intention— fear that the arrestee was armed—that normally attaches to such searches).

*Whren v. United States*, 517 U.S. 806 (1996), cited by the majority, is but one example of the general rule that pretextual searches and seizures do not violate the Fourth Amendment. In *Whren*, the Supreme Court held the stop of a vehicle for a minor traffic violation did not violate the Fourth Amendment even though the officer was using the stop "as pretext[ ] for pursuing other investigatory agendas." *Id.* at 811. The Court stated:

> We [have] flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal

---

**5**In *Scott*, officers obtained a warrant to intercept the phone calls of a suspected drug dealer. *Id.* at 131. The warrant required the officers to minimize their interception of non-narcotics-related phone calls. *Id.* The wiretap resulted in the arrest and indictment of more than twenty individuals. *Id.* Scott moved to suppress the intercepted phone calls on the ground officers had failed to comply with the minimization requirement. *Id.* at 132. The district court granted the motion to suppress, concluding that even if every intercepted phone call had been narcotics-related, the officers' failure to make any good faith efforts to comply with the minimization requirement rendered the wiretap illegal. *Id.* at 132-34. The court of appeals reversed because the court could not conclude that reasonable efforts at minimization would have prevented the interception of any of the phone calls. *Id.* at 134. After a jury trial on remand, Scott was convicted. The court of appeals affirmed, *id.* at 135, and the Supreme Court affirmed the court of appeals. *Id.* at 137-38. The Supreme Court rejected Scott's contention that the officers' "failure to make good-faith efforts to comply with the minimization requirement is itself a violation of [the wiretap statute]." *Id.* at 135. The Court explained that the "existence vel non of such a violation turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," not on the officers's subjective intentions. *Id.* at 136.

> justification. . . . [S]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional. We described *Robinson* [414 U.S. at 236] as having established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

*Id.* at 812-13 (internal citations omitted). It is really quite simple. If you are engaged in conduct that justifies your detention, you must put up with that detention, even if the officer who detained you did so out of some secret—and constitutionally insufficient—motive.

There is good reason to eschew inquiry into the subjective motivations of individual officers. First, such an approach provides "arbitrarily variable" protection to individual rights. *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). If the subjective intentions of the arresting officers are the touchstone of constitutional analysis, courts may reach divergent results about searches and seizures that are utterly indistinguishable in the eyes of the person whose rights are at stake. *See id.* at 154.[6] Second, the inquiry into subjective intentions is impossibly difficult, expensive, and prone to error. As the Supreme Court explained in *Harlow v. Fitzgerald*,

---

[6]For example, imagine two drug smugglers speeding, illegally, down the highway who are stopped by police. Each smuggler is identical in every respect, save one: one is stopped by an officer totally ignorant of the fact that the car is carrying drugs, the other by an officer who suspects the driver's involvement in a drug ring. Seen from the perspective of the two drivers, each should face an identical penalty. Each broke the law and made himself subject to being stopped. But if the suspicious officer's subjective intentions invalidate his stop, then one driver escapes punishment while the other does not. As *Devenpeck* explained, an individual's right to be free of arrest should not depend upon such chance factors as which police officer arrested him. *Id.* at 155-56.

[t]here are special costs to subjective inquiries of this kind. . . . Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

457 U.S. 800, 816-817 (1982) (footnotes and internal quotation marks omitted). *Whren*, along with *Harlow*, *Robinson*, *Scott*, and *Macon*, makes clear that al-Kidd's arrest on an objectively valid warrant supported by probable cause violated none of al-Kidd's constitutional rights. At a minimum, these cases would have given a reasonable officer good reason to believe that al-Kidd's arrest was constitutionally permissible.

The majority's efforts to distinguish *Whren* are unpersuasive. The majority contends that *Whren* and like cases are inapplicable whenever the government acts without probable cause to believe that the *subject* of the arrest is guilty of some criminal wrongdoing. Maj. Op. at 12296-97. To reach this result, the majority imports the "programmatic purpose" test ordinarily reserved for administrative or "special needs" search cases. The programmatic purpose test, of course, tests the constitutional validity of *warrantless* searches and seizures, such as drunk driving roadblocks, by requiring the government to prove its program serves governmental interests other than the routine collection of evidence for criminal prosecution. *See, e.g., Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001); *City of Indianapolis v. Edmond*, 531 U.S. 32, 45 (2000). The special needs cases are the sole exception to the general principle that, in testing compliance with the Fourth Amendment, courts are limited to an examination of the objective circumstances which justify the search or seizure, and may not inquire into official purpose. *Whren*, 517 U.S. at 812 ("Not only have we *never* held, outside the context of inventory search or administrative inspection[,] . . . that an officer's motive invalidates objectively justifiable

behavior[,] . . . we have repeatedly held and asserted the contrary."). The programmatic purpose test applies here, the majority says, because in *Edmonds*, the Supreme Court said that *Whren* did not apply whenever the government conducted a search or seizure without "probable cause," and because "probable cause" means only probable cause to believe the subject of the arrest committed some wrongdoing. The cases the majority cites offer no support whatsoever for the majority's approach.

First, the special needs cases have no bearing on the inquiry into al-Kidd's arrest for the simple reason that al-Kidd was arrested pursuant to a warrant issued by a neutral magistrate. The "programmatic purpose" inquiry is necessary to test the validity of a special needs search precisely because such searches occur without the procedural protections of the warrant requirement and the magisterial supervision it entails. As the Supreme Court explained in *New York v. Burger*, a statute authorizing a warrantless administrative or special needs search must provide

> a constitutionally adequate *substitute for a warrant*.
> In other words, the regulatory statute must perform
> the two basic functions of a warrant: it must advise
> the owner of the commercial premises that the search
> is being made pursuant to the law and has a properly
> defined scope, and it must limit the discretion of the
> inspecting officers.

482 U.S. 691, 710-11 (1987) (emphasis added) (quotations omitted). Material witness warrants, though not based on individualized suspicion of wrongdoing are, of course, warrants: they are based on an individualized determination that the subject of the warrant is in possession of information material in a criminal proceeding and is likely to flee; they are approved by a neutral magistrate; they are subject to continuing oversight; and they issue only upon a showing of probable cause. *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir.

1971); 18 U.S.C. §§ 3144; Fed. R. Civ. P. 46. The "special needs" cases bear little resemblance to the highly supervised process of obtaining a material witness warrant. Given the protections in § 3144, there is simply no need to inquire into the government's "programmatic purpose," and no case has ever so required.

Second, the majority's "traditional" definition of "probable cause," which limits probable cause to mean only probable cause to believe that the arrestee is guilty of wrongdoing, Maj. Op. at 12297-98, reflects a fundamental misunderstanding of the Fourth Amendment. The validity of a police action under the Fourth Amendment turns not on the guilt or innocence of the arrestee, but on whether the government's reasons for arresting the individual are weighty enough, and probably factually likely enough, to justify the intrusion into some individual's rights.[7] *See United States v. Knights*, 534 U.S. 112, 118-19 (2001) ("The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.") (internal quotation marks omitted). The "probable cause" requirement assures that there is sufficient evidence to believe that the facts that justify the issuance of the warrant exist—that there is a sufficient "probability" the government will find what it is looking for when it intrudes. *Id.* at 121.

Until today, no case has suggested that the only governmental interest of sufficient weight to justify an arrest is a rea-

---

[7]This is not to deny the existence of what the majority terms the "substantive component" of the Fourth Amendment. Maj. Op. at 12298. Instead, this merely demonstrates that this "substantive component" of the Fourth Amendment can be satisfied by *any* governmental interest— whether to detain a wrongdoer or to provide for the production of evidence against a wrongdoer—weighty enough to justify an intrusion into individual rights.

sonable belief that the arrestee has committed a crime. Most importantly, the Supreme Court has stated that the government's interest in the integrity of the justice system is important enough to justify the arrest of a wholly innocent person to secure that witness's appearance at trial. *See Stein v. New York*, 346 U.S. 156, 184 (1953) ("The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness."), *rev'd on other grounds by Jackson v. Denno*, 378 U.S. 368 (1964); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 616-17 (1929) ("The constitutionality of [the material witness statute] apparently has never been doubted.").[8] Our own jurisprudence, too, has recognized that "probable cause" for an arrest may exist even in the absence of a reasonable belief that the arrestee has committed wrongdoing. For example, police officers may arrest individuals innocent of any crime if the officer has reason to believe that the individual is a danger to himself. *Maag v. Wessler*, 960 F.2d 773, 776 (9th Cir. 1992). To be sure, in the great run of arrest cases, the relevant inquiry will be whether officers had probable cause to believe the subject committed wrongdoing. But none of the cases the majority claims defines probable cause had occasion to consider whether such belief was the *only* belief that could justify an arrest.

---

[8]The majority needlessly casts doubt upon the validity of § 3144. Even if the Supreme Court's statements on the issue are dicta, they have considerable weight here. In part because we cannot "lightly" disregard any Supreme Court precedent, *Siskiyou Regional Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 549 n.1 (9th Cir. 2009), and in part because this court has already positively commented on these statements, *see Bacon*, 449 F.2d at 941. In any event, Al-Kidd does not contend that a showing of probable cause to believe (1) that a witness has information that is material in any criminal proceeding and (2) the witness's appearance cannot be secured by subpoena is insufficient to provide objective justification for an arrest. *See* Appellee's Brief at 43. Notably, in neither *Barry* nor *Stein* was there any suggestion that the validity of a material witness warrant would either turn on the subjective intentions of the officers or depend upon a demonstration that there was probable cause to believe the subject of the arrest was guilty of wrongdoing.

In the closely analogous context of searches, it is clear that, consistent with the Fourth Amendment, government agents, with a warrant supported by probable cause, may intrude to search upon the premises even of individuals who are suspected of no wrongdoing whatsoever. In *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), government agents obtained a warrant to search the offices of the Stanford Daily for photographs that might reveal the identity of protesters who had assaulted policemen during a campus disturbance. *Id.* at 548. There was no claim that Stanford Daily photographers or employees were themselves the assailants. *See id.* The Supreme Court held the warrant was valid, despite the fact that members of the Stanford Daily were not suspected of having done anything wrong: "[V]alid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." *Id.* at 554 (emphasis added); *see also Steagald v. United States*, 451 U.S. 204 (1981) (holding that an arrest warrant does not authorize officers to enter the homes of third parties to execute the warrant, absent exigent circumstances, without first obtaining a warrant to enter the premises).[9]

Though *Zurcher* involved a search, rather than a seizure, its rationale is applicable here and squarely rejects the majority's contention that the probable cause requirement of the Fourth Amendment may be satisfied only by suspicion of wrongdoing by the subject of the intrusion. As the Supreme Court

---

[9]*Steagald* also demonstrates that the majority's invocation of the Wilkes cases is inapposite. The evil associated with the general writs and writs of assistance used in the colonial period was that these warrants "provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into a particular home." *Id.* at 220. § 3144 provides precisely the check on official discretion that was absent during the colonial period: supervision by a neutral magistrate. It was not Lord Halifax or even Attorney General Ashcroft who signed the material witness warrant that authorized Al-Kidd's arrest. It was a federal magistrate judge.

explained, the property owner's guilt or innocence is simply irrelevant to the constitutional analysis: "it is apparent that whether the third-party occupant is suspect or not, the State's interest in enforcing the criminal law and recovering the evidence remains the same . . . ." *Zurcher*, 436 U.S. at 560. And one who knows he has evidence relevant to a criminal prosecution but refuses to hand such evidence over to prosecutors "is sufficiently culpable to justify the issuance of a search warrant." *Id.* The same holds true for a material witness. The government's interest in recovery of evidence from a material witness is the same whether the witness is guilty or innocent of wrongdoing. The need to obtain evidence from that witness and secure his appearance at trial is of sufficient weight to justify an arrest. *See Stein*, 346 U.S. at 184; *Barry*, 279 U.S. at 616-17.

In short, our cases, and those of the Supreme Court, have routinely recognized that "probable cause," within the meaning of the Fourth Amendment, may be satisfied by proof of something other than wrongdoing by the subject of the search or seizure.

Of course, taken to its logical conclusion, the majority opinion renders the material witness statute entirely superfluous. To arrest and confine an individual pursuant to the material witness statute, the government must establish "probable cause." *Bacon*, 449 F.2d at 941-43. If "probable cause" exists only when the *subject* of an arrest is suspected of a crime, then a material witness can be arrested as a suspect, and the material witness statute adds nothing.[10] This result is risible.[11]

---

[10]The majority contends it does not render the material witness statute superfluous by arguing that if the statute is "genuinely" used to secure the testimony of a witness at trial, a showing of probable cause that the arrestee has engaged in wrongdoing is not required, and that only when the statute is being used as a pretext for criminal investigation is a showing of probable cause "*including individualized suspicion of criminal wrongdoing*" required. Maj. Op. at 12303. (emphasis in original). This

Once the government demonstrated to a neutral magistrate
that it had probable cause to believe al-Kidd had information
material to a criminal proceeding and was likely to run off to
Saudi Arabia, the *Whren* rule applied with full force, and
nothing in *Edmond* or any case the majority cites suggests
otherwise.

Third, the Supreme Court's decision in *United States v.
Villamonte-Marquez*, 462 U.S. 579 (1983), which the major-
ity inadequately addresses, casts even greater doubt on the
correctness of the majority's decision. In that case, the
Supreme Court authorized precisely what the majority says
can never be permissible: a pretextual seizure in the absence
of reasonable suspicion or probable cause. In that case, cus-
toms agents, acting on a tip about marijuana smuggling,
detained a sailboat pursuant to 19 U.S.C. § 1581(a). That stat-
ute authorized customs agents to "board any vessel at any

argument suggests that the probable cause standard for issuing a warrant
can vary depending on the subjective intention of the officer seeking the
warrant. Not only is there no support in the case law for such a position,
it is directly contradicted by the holding in *Whren*. 517 U.S. at 811. Fur-
thermore, the majority seems implicitly to recognize that probable cause
can encompass more than the likelihood that the arrestee has engaged in
criminal wrongdoing. Otherwise the majority's argument reads the neces-
sity of showing probable cause right out of the issuance of a material wit-
ness warrant when the prosecutor "really" wants to obtain evidence for
trial, and thus runs directly against the express language of the Fourth
Amendment. If the prosecutor wants a material witness warrant because
he "really" wants to secure that person's testimony at trial, according to
the majority, he need not show probable cause that the potential witness
engaged in wrongdoing. However, unless the majority also recognizes that
probable cause in this context means showing a likelihood that the arrestee
has material testimony, and that it will become impracticable to secure his
presence by subponea as required by 18 U.S.C. § 3144, then the majority
would be sanctioning the issuance of an arrest warrant without any proba-
ble cause whatsoever.

[11]And we have been wasting much printer's ink on material witness
statutes which have existed at least since the late Eighteenth Century. *See
Bacon*, 449 F.2d at 938-41.

time and at any place in the United States to examine the vessel's manifest and other documents." *Id.* at 580. While executing the document inspection, officers smelled marijuana. They found 5800 pounds of the stuff on board the ship and arrested the crew. *Id.* at 583. The crew members were convicted for conspiracy to import marijuana. *Id.* On appeal, the Fifth Circuit reversed the convictions, holding the detention was invalid—the officers lacked constitutionally sufficient individualized suspicion of wrongdoing—and the fruits of the detention were barred from evidence. *Id.* at 583-84. The Supreme Court reversed the decision of the Fifth Circuit and upheld the convictions. *Id.* at 584. The Court held that the special difficulties associated with enforcement of maritime registration laws justified suspicionless stops and inspections on waterways. *Id.* at 591. The Court emphasized the long historical pedigree of § 1581(a) as proof that the Founders did not believe such intrusions violated the Fourth Amendment. *Id.* at 584-85. In a footnote, the Court rejected the crew members' contention that the customs officers' subjective intentions rendered the stop and inspection pretextual and thus unlawful:

> Respondents, however, contend . . . that because the Customs officers were accompanied by a Louisiana State Policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marijuana, they may not rely on the statute authorizing boarding or inspection of the vessel's documentation. This line of reasoning was rejected in a similar situation in *Scott* . . . and we again reject it.

*Id.* at 584 n.3.

Like the statute at issue in *Villamonte-Marquez*, some version of the material witness statute has been on the books since the late-1700s. *See Bacon*, 449 F.2d at 938-41. Since then, courts have approved the constitutionality of the power

to detain material witnesses. *See supra* note 11. As the Supreme Court explained, the " 'duty to disclose knowledge of crime . . . is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness.' " *Bacon*, 449 F.2d at 939 (quoting *Stein*, 346 U.S. at 184).

Finally, *Villamonte-Marquez* also underlines the point that, even assuming we must consider the "programmatic purpose" behind al-Kidd's detention, the relevant inquiry is not into the motivations of individual officers who obtained and executed the particular warrant on which al-Kidd was detained, but into the "programmatic purpose" that provides the constitutional justification for the material witness statute. *See Edmond*, 531 U.S. at 457 ("[W]e caution that the purpose inquiry in this context is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene."). The justification for the use of material witness warrants is the need to assure the proper functioning of the judicial system; this interest is divorced from the government's general interest in crime control and is sufficient, al-Kidd concedes, to justify an arrest. Because this governmental interest justifies this intrusion into al-Kidd's liberty, and because the intrusion is subject to a warrant requirement, inquiry into the minds of individual officers is neither necessary nor desirable. *See Villamonte-Marquez*, 462 U.S. at 584 n.3.

But even if al-Kidd's arrest on a pretextual material witness warrant violated his Fourth Amendment constitutional right not to be subjected to an unreasonable seizure, any such right was certainly not "clearly established" in March 2003. As the majority notes, for a right to be clearly established there need not be a case on point, but the violation must be "apparent" to a reasonable official. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In March 2003, when al-Kidd was arrested on a material witness warrant, it would hardly have been "apparent" to a reasonable official that using a valid material witness warrant as a pretext to accomplish other law-enforcement objec-

tives was constitutionally impermissible, especially if the official had read *Whren*, *Robinson*, *Scott*, or *Macon*.

No court had ever questioned the constitutional validity of the material witness statute. No court had ever held that the "programmatic purpose" test applied to searches or seizures conducted pursuant to a warrant. No court had held that "probable cause" in the Fourth Amendment meant *only* probable cause to believe the subject of the search or seizure had committed criminal wrongdoing. Every pronouncement by the Supreme Court would have suggested that the pretextual use of a valid warrant was perfectly legal.

Eight months after al-Kidd's arrest, for the very first time, and in dicta no less, a court of appeals stated that the pretextual use of material witness warrants was "improper." *United States v. Awadallah*, 349 F.3d 42, 59 (2d Cir. 2003) ("The district court noted (and we agree) that it would be improper for the government to use § 3144 for other ends, such as the detention of persons suspected of criminal activity for which probable cause has not yet been established.").[12] Prior to that, only one district court had said anything similar. *See United States v. Awadallah*, 202 F. Supp. 2d 55, 78 (S.D.N.Y. 2002), *rev'd on other grounds by Awadallah*, 349 F.3d 42. In light of the substantial contrary authority spelling out that an officer's subjective intentions do not invalidate an objectively valid warrant, this solitary district court decision was hardly sufficient to make it "apparent" to a reasonable official that

---

[12]Obviously, we are not bound by the decision of another circuit, especially if that part of the decision was *dicta*. In any event, unlike in our circuit, dicta in the Second Circuit is not binding authority even in the Second Circuit. *Jiminez v. Walker*, 458 F.3d 130, 142-43 (2d Cir. 2006). It also remains to be said: what did *Awadallah* mean by the use of "improper"? It could mean anything from pecksniffian distaste to sanctionable conduct by an officer of the courts, and from harmless error to grounds for reversal. It seems not even a thin reed upon which to base an assertion it proclaimed to the nation's constabulary a "clearly established" constitutional right.

the pretextual use of material witness warrants was unconstitutional. *See Sorrels v. McKee*, 290 F.3d 965, 970-71 (9th Cir. 2002) (holding that two district court decisions were insufficient to make a right "clearly established").

The Supreme Court has flatly stated that pretextual searches and seizures conducted pursuant to a warrant issued upon objectively reasonable probable cause do not violate the Fourth Amendment. Nothing in the majority opinion provides any justification for departing from this rule. Attorney General Ashcroft is entitled to qualified immunity.

III. Al-Kidd's complaint fails to allege Ashcroft instructed or knowingly allowed FBI agents to present false affidavits to the magistrate judge who issued the material witness warrant.

Al-Kidd's remaining claim is that Ashcroft is personally liable for al-Kidd's detention on a material witness warrant obtained on the basis of intentional or reckless material misrepresentations or omissions. Of course, this claim raises totally different constitutional issues than that based on pretext.

It is not disputed that al-Kidd has a clearly established constitutional right not to be detained on a warrant based on an agent's deliberate or reckless misrepresentations or omissions. *See Franks v. Delaware*, 438 U.S. 154, 164-72 (1978). But it was Ashcroft's subordinates, not Ashcroft himself, who obtained the material witness warrant on which al-Kidd was detained. Al-Kidd makes only conclusory allegations Ashcroft ordered his subordinates to arrest individuals on invalid warrants. But such conclusory allegations do not suffice. Before we reach the merits of al-Kidd's claims the affidavits were false, we must determine if he alleges *facts* sufficient to establish Ashcroft's personal liability. I disagree with the majority's conclusion that Ashcroft may be held liable for what his subordinates may have done here, because al-Kidd's

complaint simply does not state facts that plausibly establish Ashcroft, "through [his] own actions," violated al-Kidd's rights under the material witness warrant statute or the Constitution. *Iqbal*, 129 S. Ct. at 1948.

The majority concludes Ashcroft may be held liable in al-Kidd's *Bivens* action for his "knowing failure to act" in the light of evidence of unauthorized abuses, and that al-Kidd's pleadings are sufficient to establish plausibly that Ashcroft had knowledge of "abuses" occurring under § 3144 and failed to act to correct these abuses.[13] Maj. Op. at 12315-16.

What "abuses"? The abuses to which al-Kidd refers in his allegations are not lies or omissions included in supporting affidavits, but pretextual arrests. But, as shown above (in Part II, "Qualified Immunity"), such "abuses" violate neither the statute nor the Constitution. And to allege Ashcroft's knowledge of these "abuses" does not allege facts that plausibly establish Ashcroft knew of or encouraged his subordinates recklessly to disregard the truth in the preparation of supporting affidavits. *See Franks*, 438 U.S. at 164-72.

In reviewing al-Kidd's allegations regarding Ashcroft's personal involvement, ask yourself after each one, "Did al-Kidd here allege facts that plausibly establish Ashcroft

---

[13]Ashcroft cannot be held liable for the acts of his subordinates on a theory of respondeat superior or vicarious liability. *Id.* at 1948. It is doubtful that the majority's "knowing failure to act" standard survived *Iqbal*. There, the Court held that Ashcroft could not be held liable for his "knowledge and acquiescence" in his subordinates' alleged unconstitutional discrimination against Muslim men after 9/11. *Id.* at 1949. The Court explained: "[P]urpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id.* at 1949. Here, because al-Kidd has not alleged that Ashcroft knew his subordinates were making deliberate or reckless material misrepresentations or omissions in material witness applications, much less that it was Ashcroft's purpose they do so, al-Kidd's allegations clearly fail *Iqbal*'s requirements.

ordered or knowingly tolerated agents swearing to false facts in their affidavits?":

- Ashcroft stated publicly that "[a]ggressive detention of lawbreakers and material witness warrants is vital to preventing, disrupting, or delaying new attacks."

- A Justice Department policy memo stated that federal law enforcement personnel were to use "every available law enforcement tool" to arrest terror "suspects." This included the use of "aggressive arrest and detention tactics."

- One Justice Department official admitted that the material witness policy amounted to "preventive detention."

- Other Justice Department officials admitted that material witness warrants were an important "investigative tool" whereby they could obtain "evidence" about the witness. Similarly, FBI Director Mueller stated that several "suspects" had been detained on material witness warrants.

- One news report stated that 50% of those detained on material witness warrants were never called to testify. One Justice Department official admitted that this statistic proved that material witness warrants were a "ruse" to detain suspects.

- "Abuses" occurring under the statute were "highly publicized" in the media.

- The department apologized to several individuals arrested on material witness warrants.

In each case, the answer to the question put is a flat "no." These allegations certainly do suggest Ashcroft encouraged

prosecutors to use valid material witness warrants as a means to accomplish other law-enforcement objectives. But none of the allegations contain facts that plausibly establish Ashcroft's knowledge that his subordinates were obtaining material witness warrants on the basis of deliberately or recklessly false evidence or on facially invalid warrants. Some of al-Kidd's allegations suggest precisely the opposite—that Justice Department officials were careful to ensure they had probable cause to believe that the targeted witness had information material to a criminal proceeding and was likely to flee before seeking a material witness warrant:

- David Nahmias, Counsel to the Assistant Attorney General, stated that when they were unable to charge a particular suspect, they "*got enough information* at least to make him a material witness." ER 32 (emphasis added).

- Attorney General Alberto Gonzales, Ashcroft's successor, stated that when the agency became interested in a subject, the agency would "consider" its options. ER 31.

Al-Kidd's pleadings do establish that some material witnesses were detained who did not testify or did not prove to have material information. But these facts do not plausibly suggest federal agents employed intentional or reckless mendacity in swearing out false affidavits. Some witnesses' testimony may not have been required because defendants took plea deals or prosecutors found other sources of information. In some cases, agents may simply have been wrong or may have acted "hastily" or negligently in conducting investigations. That does not amount to a *Franks* violation. *See Franks*, 438 U.S. at 165. That the DOJ apologized to some detainees hardly suggests an admission of impropriety rather than simple error.

The majority also concludes al-Kidd has plausibly alleged that Ashcroft "purposely instructed his subordinates to bypass

the plain reading of the statute." Maj. Op. at 12316. All of the allegations the majority cites in support of this proposition demonstrate Ashcroft "purposely instructed" his subordinates to use the statute *pretextually*, but not *unlawfully*. The majority doesn't get it; al-Kidd must plead not only that Ashcroft had a "concerted strategy" or that Ashcroft used "enhanced" techniques, Maj. Op. at 12318, but that such "concerted strategy" or "enhanced" techniques actually included the use of false affidavits or facially invalid warrants, not just the use of pretextual witness warrants. A "concerted strategy" or "enhanced" technique to "misuse" material witness warrants is not enough, unless such "misuse" includes the use of false affidavits, not just pretextual arrest warrants. And nothing in al-Kidd's allegations plausibly suggests Ashcroft instructed, encouraged, or tolerated his subordinates to detain individuals as to whom there was no objective probable cause to arrest. It may be conceivable *to al-Kidd* that Ashcroft encouraged his subordinates to flout the requirements of § 3144, but al-Kidd's allegations have not "nudged [his] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Because al-Kidd has not pleaded adequately that Ashcroft, by his own actions, violated al-Kidd's constitutional rights, I dissent from part B.4 of the majority opinion.

IV.    Absolute Immunity

The remaining question is whether and to what extent Ashcroft enjoys absolute immunity for his alleged actions—and inactions—related to the issuance of material witness warrants. As explained above, I conclude all of al-Kidd's claims are precluded on other grounds. Accordingly, were it up to me, I would not reach this question. However, because the majority addresses the issue, and because I think the majority's "immediate purpose" test is difficult to define and apply, and is unsupported by case law, I will explain my disagreement.

In *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Supreme Court held that a prosecutor enjoyed absolute immunity from suit by a former inmate, whose conviction had been set aside in collateral proceedings. The former inmate's suit alleged that the prosecution had been commenced wrongfully, that the prosecutor had elicited false testimony on the stand, and that the prosecutor concealed exculpatory evidence from the defense, actions even more heinous than those alleged against Ashcroft by al-Kidd. *Id.* at 415-16. The court articulated two justifications for imposing an absolute bar to recovery: first, absolute prosecutorial immunity reflects the common law immunity of judges and juries, *id.* at 424;[14] second, absolute immunity is necessary to avoid the "intolerable burdens" that damages claims by disgruntled criminal defendants would place on prosecutors, *id.* at 425-26. Absolute prosecutorial immunity obviously leaves some wrongs—grievous wrongs—unremedied, but the "balance of evils" nonetheless tilts in favor of absolute immunity; otherwise, prosecutors would live in constant fear that their actions on behalf of the public would subject them to personal liability and possible poverty. *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 859 (2009).

However, despite the tremendous importance of absolute immunity, prosecutors do not enjoy absolute immunity for every act they undertake as prosecutors. To determine whether a prosecutor enjoys absolute immunity, rather than the lesser qualified immunity afforded all government agents,

---

[14]Justice Scalia has observed that the doctrine of absolute prosecutorial immunity has strayed far from its common law roots, but that the doctrine nonetheless retains its vitality. *See Kalina v. Fletcher*, 522 U.S. 118, 131-135 (1997) (Scalia, J., concurring) ("[T]he 'functional categories' approach to immunity questions imposed by cases like *Briscoe*, make faithful adherence to the common law embodied in § 1983 very difficult. But both *Imbler* and the 'functional' approach are so deeply embedded . . . that, for reasons of *stare decisis*, I would not abandon them now."). Accordingly, Ashcroft's failure to introduce evidence that, at common law, prosecutors had absolute immunity against claims related to material witness warrants is not significant.

courts consider the "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. at 127. Under the "functional approach," a prosecutor enjoys prosecutorial immunity only when he performs a function "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. On the other hand, a prosecutor has no absolute immunity for "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of an advocate." *Id.* at 430-31. The *Imbler* court acknowledged that "drawing a proper line between these functions may present difficult questions." *Id.* at 431 n.33.

Deciding which witnesses to call at trial is part of the prosecutor's role as an advocate, *Imbler*, 424 U.S. at 431 n.33, as is the "marshaling" of evidence for trial, *Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005). Accordingly, several circuits, other than the Ninth, have squarely held that prosecutors have absolute immunity for seeking a material witness warrant.[15] And no case has held that absolute immunity does not shield a prosecutor's decision to seek such a warrant.

Ashcroft, of course, did not himself file the application or swear out the facts in support of the application. Ashcroft acted only as a supervisor. Though a supervisor's acts are in

---

[15]*See, e.g.*, *Odd v. Malone*, 538 F.3d 202, 213 (3rd Cir. 2009) (noting that a prosecutor has prosecutorial immunity for obtaining a material witness warrant shortly before the commencement of trial, but holding that the prosecutor lacks absolute immunity for failing to notify the court that trial was over and thus permit the witness's release); *Betts v. Richard*, 726 F.2d 79, 81 (2d Cir. 1984) ("It is clear that the issuance of the capias was intimately associated with procuring attendance of a witness for imminent trial. Absolute immunity attaches to this act, and any claimed improper motive is irrelevant."); *Daniels v. Keiser*, 586 F.2d 64, 69 (7th Cir. 1978) ("Because defendant was attempting to secure Daniels' presence at the resumption of the trial[,] . . . he was functioning as an advocate rather than as an investigator."); *White ex rel. Swafford v. Gerbitz*, 860 F.2d 661, 665 n.4 (6th Cir. 1988) (stating, in dicta, that prosecutor's decision to procure a material witness warrant is protected by absolute immunity).

one sense always administrative, a supervisor enjoys absolute immunity only for supervisory decisions that "require legal knowledge and the exercise of related discretion" and relate to activities for which the supervised attorney enjoys absolute immunity. *Van de Kamp*, 129 S. Ct. at 861-62 (holding that a prosecutor enjoyed absolute immunity from Goldstein's claims that supervisor's failure to train prosecutors about the need to disclose exculpatory evidence resulted in his unlawful conviction). There is "no meaningful distinction between a decision on prosecution in a single instance and decisions on prosecutions formulated as a policy for general application." *Roe v. City & County of San Francisco*, 109 F.3d 578, 583-84 (9th Cir. 1997).

*Kalina v. Fletcher* makes clear Ashcroft lacks absolute immunity for claims related to his supervision of the FBI agents, such as Mace, who acted as witnesses in support of a warrant application. *See* 522 U.S. at 129-30. When an individual, even an attorney, serves as a complaining witness in support of a warrant application, the individual enjoys only qualified immunity, *id.*, and accordingly Ashcroft lacks absolute immunity for supervising such individuals. *See Roe*, 109 F.3d at 583-84. Whether Ashcroft enjoys absolute immunity for his supervision of the United States Attorneys who prepared the warrant application and made the decision to file it is a different question.

I would hold that so long as the "criminal proceeding" for which the material witness warrant is sought is a criminal trial, rather than an investigatory proceeding,[16] the decision to seek a material witness warrant should be shielded by absolute immunity. Such a decision is clearly one "intimately

---

[16]*See Buckley v. Fitzsimmons*, 509 U.S. 259, 274-75 (1993) (holding that a prosecutor lacked absolute immunity for acts taken in preparation for appearing before an investigatory grand jury); *see also Bacon*, 449 F.2d at 939 (noting that a material witness warrant may issue to secure the presence of a witness before an investigative grand jury proceeding).

associated with the judicial phase of the criminal process."
*Imbler*, 424 U.S. at 430; *see also supra* note 14. The critical
factor in the decision to seek a material witness warrant is the
prosecutor's professional judgment about how much that wit-
ness knows, how important the witness's testimony might be,
and what effect his arrest may have on his testimony. *See
Kalina* 522 U.S. at 130 (holding that absolute immunity pro-
tects decisions involving the "exercise of professional judg-
ment"). And the ultimate decision whether to call the detained
witness depends on the prosecutor's final trial strategy, which
may evolve over time as events unfold. *See Roe*, 109 F.3d at
583-84 (holding that a prosecutor's decision not to call a wit-
ness at trial was protected by absolute immunity). Both of
these decisions are decisions that only a prosecutor can make.

Moreover, like other quasi-judicial acts, an individual's
detention on a material witness warrant is subject to continu-
ing oversight, and errors may be corrected through the judicial
process. *Cf. Mitchell*, 472 U.S. at 522-23 (holding that a pros-
ecutor did not enjoy absolute immunity for his decision to
engage in illegal wiretapping and explaining that the judicial
process, unlike wiretapping, is "largely self-correcting: proce-
dural rules, appeals, and the possibility of collateral chal-
lenges obviate the need for damages actions to prevent unjust
results").[17] Here, Al-Kidd was not detained up until the start

---

[17]The Third Circuit's decision in *Odd* did not, as the majority con-
cludes, hold that the policy considerations underlying absolute immunity
do not apply in the material witness context. 538 F.3d 202. In *Odd*, no one
questioned that the decision to *seek* a material witness warrant was pro-
tected by absolute immunity. The issue in *Odd* was the prosecutor's "fail-
[ure] to notify the court of the status of a detained witness." *Id.* at 216. As
the court noted, compliance with Rule 46, once trial is complete or during
a "clearly delimited" break in judicial proceedings, is a purely ministerial
task. *Id.* at 212-14. Unlike the decision whether to call a witness to the
stand, the decision to release a material witness once trial is over requires
the exercise of no professional judgment at all, and the threat of civil dam-
ages liability cannot interfere with the prosecutor's decision making. *Id.*
at 216. It is unsurprising that the Third Circuit found that the detained

of trial, but was released upon conditions, selected by a neutral magistrate, thought necessary to secure his appearance as a witness at trial.

Ultimately, the decision whether to seek a material witness warrant in conjunction with an upcoming trial is akin to both the decision to call a witness at trial and to seek a warrant to arrest a suspect. A prosecutor enjoys absolute immunity for both of these acts, regardless of any improper motive, and should enjoy a similar immunity here. *See Imbler*, 424 U.S. at 431 n.33; *Kalina*, 522 U.S. at 129.

Both the majority and al-Kidd concede that a prosecutor sometimes has absolute immunity for the decision to seek a material witness warrant. *See* Maj. Op. at 12284-85. The majority, returning to its trope the prosecutors' pretextual motivations invalidate an otherwise properly obtained warrant, *see* Maj. Op. at 12290, contends, however, the cases holding a prosecutor has absolute immunity for the issuance of a material witness warrant—*Odd*, *Betts*, *Daniels*, and *Swafford*—are distinguishable because none involved allegations a prosecutor intended to use the warrant to investigate the detained subject rather than to secure the witness's appearance at trial. *See* Maj. Op. at 12284-85.[18]

---

material witnesses lacked access to continuing supervision; in *Odd* the plaintiffs' *very claim* was that they had been wrongfully denied the procedural protections to which they were entitled. *Id.* at 217 ("Indeed, the failure of the ADAs to notify anyone of Plaintiffs' status assured that not even the warrant-issuing judges would review the propriety of their continued detention, thus short-circuiting the crucible of the judicial process." (internal quotation marks omitted)). The ADAs had no more right to hold the material witness after the trial ended than they would have had to hold a defendant after an acquittal was entered.

[18]The odd result of the majority's approach is that Ashcroft enjoys absolute immunity if he acts out of racial or partisan animus, but enjoys only qualified immunity if he acts in order to protect the public or investigate a suspected criminal. *See Bernard v. County of Suffolk*, 356 F.3d 495, 504 (9th Cir. 2004). Thus, the more licit Ashcroft's subjective intentions, the more liability he faces.

Rejecting what it calls a "formalistic taxonomy of acts that are inherently either prosecutorial or investigative, regardless of what each act is *really* serving to accomplish" in favor of a "teleological perspective," Maj. Op. at 12289 (emphasis added), the majority applies an "immediate purpose" test to determine whether a prosecutor is performing an investigative rather than a prosecutorial function—if the prosecutor's "immediate purpose" was to investigate the subject of the warrant rather than to secure the witness's appearance at trial, the prosecutor enjoys only qualified, rather than absolute, immunity. *Id.* at 12290. Again the majority invites inquiry into the subjective motivations of individual officers. One can tell that easily: watch for its use of the word "really."

It is true that a few courts have made reference to "purpose" in applying the functional approach.[19] But the "purpose" considered in these cases has been the product for which the warrant was directed—what evidence was called for and where it was to be produced; none of these cases authorizes the majority's wide-ranging inquiry into what a prosecutor was "really" up to. *See id.* at 22-24. Indeed, as in the Fourth Amendment context, courts have repeatedly admonished that a prosecutor's subjective intentions are irrelevant to the absolute immunity inquiry, for much the same reason they are irrelevant to the qualified immunity analysis. *See, e.g.*, *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir.

---

[19]*See, e.g., Buckley*, 509 U.S. at 274-75 (holding that prosecutor lacked absolute immunity for actions before a grand jury because the grand jury's "immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect against whom there was already probable cause to arrest"); *KRL v. Moore*, 384 F.3d 1105, 1115 (9th Cir. 2004) (denying absolute immunity where a search warrant was "to further a 'stand-alone investigation' into environmental crimes"); *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 30-31 (1st Cir. 1995) ("The mixed purpose of the civil rights investigation reflects defendants' own mixed functions."); *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995) ("To the extent that the creation of the videotapes fulfilled an investigatory purpose, Adago cannot claim absolute immunity.").

1986) (en banc) ("Intent should play no role in the immunity analysis."); *see also Betts*, 726 F.2d at 81 (2d Cir. 1984) ("Absolute immunity attaches to [seeking a material witness warrant], and any claimed improper motive is irrelevant."). The cases the majority cites are not to the contrary.

In *Buckley*, the Supreme Court held that a prosecutor lacked absolute immunity for fabricating evidence to present to a grand jury because the grand jury's "immediate purpose was to conduct a more thorough investigation of the crime— not to return an indictment against a suspect against whom there was already probable cause to arrest." 509 U.S. at 274-75. *Buckley* simply reflects the general rule that a prosecutor should not "consider himself to be an advocate before he has probable cause to have anyone arrested." *Id.* at 274. In *Buckley*, no one had been arrested; the grand jury was still investigating. Here, Al-Hussayen had been indicted, arrested, arraigned, and was awaiting trial. *Buckley* merely holds that a prosecutor who, as yet, had arrested no one, was acting as an investigator, not an advocate. *Buckley* does not hold that what "really" motivated a prosecutor is relevant to determination of what "function" the prosecutor was accomplishing when he performed the action complained of.

Neither does *KRL v. Moore*. In that case, we held that whether a prosecutor had absolute immunity for the issuance of a search warrant depended on the purpose *of the warrant*, not *of the prosecutor* in seeking the warrant. 384 F.3d at 1115. After executing a search warrant on land held by KRL, a general partnership, prosecutors indicted Robert Womack, one of the partners, on counts relating to improper waste disposal on partnership land. *Id.* at 1108. The prosecutor then obtained a second search warrant for documents related to fraud and illegal diversion of funds. *Id.* at 1109, 1113. The partnership and the partners sued under § 1983, alleging that this second search warrant was overbroad, facially invalid, and based on fraudulent affidavits. *Id.* The district court denied the prosecutor's absolute immunity claim. On appeal, this court noted

that the second search warrant had "two goals: it sought evidence to prosecute the pending indictment against Womack, and it sought to investigate and uncover new crimes." *Id.* at 1111. We held that the prosecutor enjoyed absolute immunity for the search warrant to the extent it sought evidence to prove the pending charges. *Id.* at 1111-13. However, to the extent the prosecutor sought evidence of new crimes (fraud at KRL), the prosecutors lacked absolute immunity. *Id.* at 1113-14.

We did not inquire into the prosecutor's motives in seeking the second search warrant. We inquired into the purpose of the warrant by looking to what evidence the search warrant recited it sought. That evidence was not possibly related to the prosecution of Womack, the one suspect who had been arrested, for illegally dumping toxic wastes; it was evidence of fraud and diversion of funds that had nothing to do with waste disposal. *Id.* at 1113. It does not take a mind-reader to determine that where the subject matter of the prosecution is illegal toxic waste disposal on partnership land, a search warrant to search for evidence of fraud and illegal diversion of business funds is designed to accomplish something other than proving the elements of the charged environmental crime. It merely requires reading the warrant.

*Buckley* and *KRL* are easy to apply here: if the material witness warrant on which Al-Kidd had been detained sought to force his appearance at an investigatory proceeding or a police interview, rather than a criminal trial, Ashcroft would not enjoy absolute prosecutorial immunity. The only relevant "purpose" is that derived from the product of the warrant, not what was "really" the prosecutor's motive in seeking the warrant.

To the extent that *KRL* authorizes any inquiry into what was "really" the prosecutor's motivation, such an inquiry should be strictly limited to cases where a prosecutor approves a *search* warrant application, because seeking the

issuance of a search warrant can be an investigative function, while seeking an arrest warrant cannot. The *KRL* court itself carefully limited its holding to the search warrant context, and expressly distinguished the arrest warrant context. *Id.* at 1113 ("We must emphasize that our result would not necessarily be the same had the prosecutors reviewed an arrest warrant, rather than a search warrant, prior to submission. As noted supra, the Court has stated that a prosecutor does not serve as an advocate before probable cause to arrest anyone has been established, *Buckley* . . ., but that the determination of whether probable cause exists to file charging documents is the function of an advocate . . . ."). Preparing a search warrant is not a "core" advocacy function like the preparation of an arrest warrant, the filing of charges, or the preparation of a material witness warrant.[20]

But under the majority's approach, what was "really" a prosecutor's personal, subjective "immediate purpose" is always relevant to the determination whether absolute immunity protects *any* act by a prosecutor—in court or out of court. A prosecutor would lose his absolute immunity if he prosecutes a low-level mafia functionary for the sole purpose of inducing that functionary to testify against his capo. And, absolute immunity would not clothe any question asked by a prosecutor of a witness on the stand; the prosecutor could be sued for damages on the claim he "really" asked the question

---

[20]*See generally Schrob v. Catterson* 948 F.2d 1402, 1413-15 (3d Cir. 1991) (distinguishing "core" prosecutorial functions and describing search warrants as in the "gray area" between investigative and prosecutorial functions); *see also Joseph v. Patterson*, 795 F.2d 549, 556-57 (6th Cir. 1986) (recognizing that search warrants can serve both a prosecutorial function of preparing for trial and an investigative function of gathering evidence, and holding that further factual development was required to determine the role the search warrant played); *Imbler*, 424 U.S. at 431 n.1 ("Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluation of evidence. At some point, with respect to *some* decisions, the prosecutor no doubt functions as an administrator . . . ." ) (emphasis added).

to assist in the investigation of the witness, or some other per-
son, for other crimes. Of course, what the prosecutor "really"
intended in asking the question would—as in all inquiries into
intent—be a factual inquiry, entailing precisely the kind of
expensive discovery and litigation immunity was designed to
avoid. *See Harlow*, 457 U.S. at 816-817.

Not so, says the majority. To "cabin" this obviously prob-
lematic result, the majority states that when a prosecutor
brings any prosecution, the prosecutor's "immediate purpose"
is, of course, to bring a prosecution, even if the prosecutor's
true intention is to obtain evidence for some other investiga-
tion. Maj. Op. at 12290. But there is no principled reason this
is true, other than the majority's say-so. And, if true, why
isn't the prosecutor's "immediate purpose" in this case to
secure a witness's appearance at trial rather than to obtain evi-
dence against al-Kidd? The majority provides no clues as to
how we are to distinguish which purposes are "immediate"
and which are "really" not.

Even were the "immediate purpose" test coherent, it would
nonetheless be undesirable because of the incentives it
creates. The prosecutors' ultimate decision not to call al-Kidd
to the stand features prominently in al-Kidd's proof that their
"immediate purpose" was not to obtain a conviction against
Al-Hussayen. Subjecting prosecutors to liability for such a
decision risks needless interference in the prosecutor's con-
duct of his most public function: the presentation of evidence
at trial and, indeed, deciding whether to have a trial at all.
Worse, the majority's test makes it prudent for a prosecutor
to go to trial against a defendant simply to ensure that his
actions in preparing for trial will not become subject to attack
on the grounds they were "really" designed to accomplish
some other goal.

## V.    Conclusion

The majority opinion closes with a quote from Blackstone. What Blackstone describes and condemns therein—the indefinite and secret detention of individuals accused of no crime in harsh conditions—is simply not a description of this case. Even the majority agrees that the harsh conditions of al-Kidd's confinement are not before us because al-Kidd has not adequately pleaded John Ashcroft's personal responsibility for such conditions. Al-Kidd's confinement was neither indefinite nor in secret. He was detained on a warrant issued by a neutral magistrate. The duration of that confinement was subject to continuing judicial supervision. There is no allegation that al-Kidd was held incommunicado. Nor is there any allegation al-Kidd was somehow denied the right to petition for a writ of habeas corpus, a right that has long secured individuals' freedom from the horrors Blackstone envisioned. We are not called upon to judge the constitutionality of the material witness statute. And we are not called upon to judge whether al-Kidd should be released, only whether he is entitled to proceed in his suit to recover money damages from the pocket of a cabinet-level official. Were we presented with the Blackstonian case the majority envisions, I would surely agree.[21] But we are not, and for the reasons explained above, I dissent in part and concur in part.

---

[21]Although I would distance myself from a certain measure of bristling righteousness in its remarks that al-Kidd was a U.S. citizen, married and with children at the time of his arrest. Maj. Op. at 12270. For all of that, his rights under the Constitution against unlawful arrest were no greater than those of an illegally entered, Mexican, childless spinster.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.